911 P.2d 577

**STATE of Arizona, Appellee,**

v.

**Lester Earl STRAYHAND, Appellant.**

**Nos. 1 CA–CR 92–1386, 1 CA–CR 92–1391.**

Court of Appeals of Arizona,
Division 1,
Department B.

Sept. 7, 1995.

Review Denied Feb. 21, 1996.*

---

* Corcoran, J., of the Supreme Court, did not participate in the determination of this matter.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and John Pressley Todd, Assistant Attorney General, Phoenix, for appellee.

Sandra B. Freedman, Tucson, for appellant.

## OPINION

KLEINSCHMIDT, Judge.

The Defendant, Lester Earl Strayhand, was convicted, following a trial by jury, of three counts of armed robbery and two counts of theft. Strayhand's confessions as to one of the thefts and all the robberies should not have been admitted in evidence. The State had the burden of showing that the confessions were voluntary and the totality of circumstances compels the conclusion that the police obtained those confessions by overbearing the Defendant's will. In finding otherwise, the trial court committed clear and manifest error, even when the evidence is viewed in the light most favorable to the State.[1] We reverse and remand for a new trial.

### FACTS

Sometime after one o'clock in the morning of May 23, 1991, two Jack–in–the–Box restaurants in Mesa were robbed within the span of one hour. Employees of the restaurants testified that the robber was a young African–American male with a bandage on his left cheek. In each instance, the robber placed an order at the drive-through window, paid for the order, and then pulled a gun and demanded money.

About a month later, on June 20, 1991, at around two o'clock in the morning, a Whataburger in Mesa was robbed in a similar fashion. The Whataburger employee who was working at the drive-through window testified that a young, African–American male, driving a gray Chevrolet Blazer, placed an order, paid at the window, and then drove away. The man was wearing a navy leather jacket and baseball cap and had a white bandage on his left cheek. Five minutes later the same man returned to the drive-through and placed a new order. When the employee opened the cash register, the man robbed her at gunpoint and drove away.

A short while later, a Mesa police officer saw a vehicle matching the description of the robbery vehicle in a drive-through lane at a nearby Jack–in–the–Box restaurant. He saw the driver run from the vehicle. The police recovered a plastic bag, a loaded revolver, and several fingerprints from the vehicle. A fingerprint from the inside of the driver's door was ultimately determined to match the Defendant's left thumb print, but no other matching prints were found on the gun, the plastic bag, or the broken steering column.

---

1. *State v. Amaya–Ruiz,* 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991) (state has burden of proving confessions voluntary); *State v. Ross,* 180 Ariz. 598, 603, 886 P.2d 1354, 1359 (1994) (standard of review is for clear and manifest error); *State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993) (evidence should be viewed in light most favorable to the state).

The Whataburger employee who had been robbed that morning later identified the Blazer as the vehicle used in that robbery. It had been stolen in the area a few hours earlier.

Nearby, and shortly after the officer saw the suspect flee on foot from the Jack–in–the–Box, another Mesa police officer saw the Defendant, who matched the description of the robbery suspect, driving a tan station wagon. The officer stopped the station wagon, established that it had been stolen, and arrested the Defendant. The Defendant was wearing a white shirt and beige shorts and had no bandage on his face. The police drove the Whataburger employee to the site of the arrest to identify the Defendant, but she stated that he was not the man who had robbed her earlier that morning.

The Defendant was taken to the police station for questioning. He arrived there about 3:30 a.m. and was left in a holding cell for over nine hours. The Defendant testified that he was unable to sleep during that period because the holding cell was too cold. He further testified that, though he had been offered food by the jailer, he had had nothing to eat since the previous morning. At around 12:45 p.m. on the day the Defendant was arrested, Mesa Police Detectives Ron Schoch and Curtis Adams took the Defendant to an interrogation room, gave him a *Miranda* warning, and questioned him for over two hours.

Ultimately, the Defendant was questioned on two separate occasions. We will discuss the details of the interrogations in the sequence in which they occurred. Most of the first interrogation was tape recorded, but the recorder was turned off during a break about half way through the interrogation. Detective Adams continued to discuss the case with the Defendant during that break. The record contains a complete transcript of only that part of the first interrogation which followed the break.[2]

During the second part of the first interrogation, the Defendant was given something

to eat and drink. The detectives questioned him about his friends and acquaintances and then turned their attention to the robberies. They lied to the Defendant and told him that several people, including the Whataburger employee, had identified him as the robber. The Defendant denied committing the robberies, and the officers continued their questioning concerning his friends and his activities over the past several days.

The detectives suggested on several occasions that the Defendant's lack of cooperation might make things more difficult for him. Early in the interrogation Detective Adams stated:

> I don't want to sit here all day and have to nail you down on every little thing. Don't make me do that. I will do that if I have to do it that way. *Then I will ask for a lot of jail time because you're not going to cooperate with me and I'm not going to help you.*

Later in the interview Detective Adams stated:

> I think you're sitting there lying to me and you're going to make me prove everything the hard way and I wish I didn't have to but if you're going to make me, then I will. Okay? Priors, on probation, *we can make it real uncomfortable. No cooperation.*

To this, the Defendant responded:

> Fuck everything man. Just do what you guys want to do. Send me to jail or whatever, okay. Just forget it. That's how I look at it. Just fuck it. I ain't gonna be here for too long.

A brief discussion ensued as to whether the Defendant was threatening suicide, and then the detectives returned to their questioning. The Defendant stated several times that he had told the detectives all he knew, but the detectives continued to accuse him of lying. The Defendant at one point stated, "It's a crock, just get it over with man. I don't want shit." The detectives continued their questioning and the following dialogue took place:

> request from the court of appeals, the records of the superior court show that the recording was sent to the court of appeals. There is no record that it was ever received.

**2.** The tape recording of the first part of the first interview was admitted into evidence but it has been lost. The recording was not initially forwarded with the record. Following a special

Detective Schoch ("S"): Well this is your opportunity to get it all straight okay? The Defendant ("D"): Well I have been straight.

S: We've been straight, listen, we've been straight with you since we've started talking.

D: I have been. I don't know, okay. I just want to forget it. *I don't want ...*

S: We have no reason to lie.

D: *Well I don't want answer anymore. I mean I'm in, fuck it. _____ I'm going to have a fucked up life.*

S: It's not too late to straighten it out.

D: Bull fucking shit. I've tried for too fucking long now.

S: Well maybe it's the friends you tell me you're keeping. Did you ever think about that?

D. It's not my company. *I can't do this shit.*

The interrogation proceeded with a discussion of the Defendant's failure to complete high school and failure to obtain suitable employment. The Defendant began to break down and cry and continued to make statements like: "No I don't want to hear nothing else man"; "I don't care man. I don't give a fuck. It will be all over with so what the fuck man"; and "Fuck it. It doesn't matter man." The detectives then turned to questioning the Defendant about some prior legal problems he had encountered.

D: Oh you're talking about the uh the uh endangerment and all that?

S: Uhm hum. Yeah.

D: I have no comment on that situation that happened.

S: Was this a part of, is this what came out of there, that warrant out of that or something else?

D: Yeah, I figured it has to be from.

S: Okay.

Detective Adams ("A"): *Okay so you figured this whole thing is fucked and that's why you don't want to tell us about the robbery or anything else, right?*

D: _____ *I'm not going to talk worth a shit anyway so it doesn't matter to me.*

A: Okay. Well let me ...

D: _____ time right?

A: Let me, I can't guarantee you won't do time. There's no way I can guarantee that and neither can he.

D: *Well get me outta here man. I'm going back to the fucking jail. That's all ...*

A: Let me tell you a little story here real quick. There's a lady that works over here at the Tri City Community Service Center ... she's working with them and there's programs that they can get there if you willing to ask for help, there are people that will help you. There's priests down there....

Detective Adams went on to tell the Defendant that other people who had been in trouble had been able to straighten out their lives and that if he confessed the detective would tell the county attorney that he had been cooperative. The detectives also told the Defendant that it would look better if his parole officer could write in the report that the Defendant had cooperated.

The interrogation then continued with a discussion of the events of the previous day. The detectives began telling the Defendant that all the facts seemed to point to him and that his lying was "just digging a deeper hole," and would get his "butt buried so far," that he wasn't "even gonna see daylight." Detective Schoch also told the Defendant that he was going to hang him in court and that the Defendant was "going to do some big time," unless he cooperated. He stated that his cooperation "matters on the amount of time you get," and that "we can hopefully limit some of that time." The detectives then told the Defendant that they had the lab report and that it revealed that his fingerprints were on the Blazer used in the robbery. That lab report was not actually available to the detectives until later. Finally, at the end of the first interrogation, Detective Adams stated:

I'm going to go ahead and file it and *my recommendation is you're uncooperative ...* I'm going to go ahead and file cases and *I get to go in and say you were uncooperative and didn't want to help me*

*so I've got it made. Makes me real easy here. But it's never too late.*

After the first interrogation, the Defendant was taken back to the holding cell while the detectives completed booking him before they took him before a judge for his initial appearance. During this time, Detective Adams spoke briefly with the Defendant, and according to Adams, the Defendant told him that he wanted to get some things off his chest. The detective told the Defendant that they would talk to him later because they were under time pressure to get him to the initial appearance. The Defendant later claimed that Detective Adams promised him that if he confessed they would not charge him with the robberies. The detectives testified that no such promise was made. The trial judge made no explicit finding with respect to this, but it is implicit in his conclusion that no such promise was made.

At about 5:00 p.m., the Defendant was taken before a judge for his initial appearance. The judge advised the Defendant of the charges against him and advised him of his right to counsel and his right to remain silent. *See* Ariz.R.Crim.P. 4.2(a). The Defendant was then returned to the holding cell where he spoke with his probation officer.

At about 6:00 p.m., the Defendant was taken to an interrogation room for further questioning. According to the Defendant, this second interrogation was initiated by the detectives. According to the detectives, the Defendant asked to speak to them. The trial court found as a fact that the Defendant asked to speak to the detectives.

At one point during the second interrogation, the Defendant asked if it might be in his best interests to have an attorney present. The officers told him that he had a right to an attorney and they could get one, but the Defendant said he would go ahead and answer their questions. The Defendant was questioned for about forty-five minutes, and he eventually confessed to the robberies.

The facts as they developed from the testimony of the two detectives are very confusing with regard to exactly when the Defendant confessed to what. It is unnecessary to trace all of the conflicts in the detectives'

testimony on this point because, while the record allows some room for speculation, it appears that the Defendant did admit to suspecting that the station wagon was stolen when he drove it and that this admission probably occurred early in the first interrogation. As far as the record shows, this occurred before the Defendant told the detectives that he did not want to continue with the interrogation and before they made any threats. During argument on the motion to suppress, the Defendant's attorney alluded to what the Defendant had said about the station wagon and disavowed any request to suppress statements relating to the station wagon.

At the close of the suppression hearing, the trial judge found that the State had proven compliance with *Miranda*. The judge, in alluding to the threats and promises, said, "The officers were being truthful that they could make it rough for the defendant...." He went on to say that the cooling off period between the two interrogations attenuated the promises. The judge observed, "Time did lapse without pressure, without defendant being reminded," but went on to say, "But he knew what would probably transpire in his life without continued police presence or questioning." The day following this ruling, the judge made supplemental findings in which he said:

> And I also find by a preponderance of the evidence that the statements which were made by the law enforcement officers to him that he basically could make life rough or something like—to that effect, but you are on probation. That's the truth. And because you have prior felony convictions. That's also the truth.

The judge went on to hold that the confession was not the result of promises or threats.

Later, to complete the investigation, Detective Schoch prepared a photographic lineup and showed it to the employees from each of the Jack–in–the–Box restaurants that had been robbed on May 23. The employee from the first robbery identified the Defendant approximately one month after the robbery. The clerk from the second robbery could not identify the Defendant in the photographic

lineup. The lineup was never shown to the Whataburger clerk who had been robbed in June.

At trial, the Defendant testified that he had been riding in the Blazer the night of the Whataburger robbery with a friend named Dee. He said that they had driven past the station wagon earlier in the evening, and Dee had told him that they could use it. According to the Defendant, at one point in the evening Dee dropped him off so he could make a phone call, drove away, and then returned, telling the Defendant to get in the back seat of the Blazer. The Defendant testified that he got in the Blazer and laid down in the back seat. At that point in time, Dee proceeded through the drive-through of the Whataburger and committed the robbery.

## THE CONFESSION TO THE ROBBERIES AND TO THE THEFT OF THE BLAZER WAS THE RESULT OF THREATS

All confessions are presumed to be involuntary, and the state bears the burden of proving by a preponderance of the evidence that any confession is voluntary and freely given. *Amaya–Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272. The trial court must consider the totality of circumstances to determine whether a confession is voluntary. *Id.*

The Defendant had been in police custody for approximately twelve hours before the first interrogation began. He had not slept nor eaten since the previous morning. The first interrogation lasted for over two hours, during which the Defendant broke down and cried and made at least one veiled suicide threat which one of the detectives recognized as such. The significance of these points is that, while the Defendant's condition alone was certainly not enough to say that he was not acting of his own free will, the court should evaluate voluntariness "in light of what the police should perceive from the objective manifestations of the suspect's physical or mental condition." *State v. Carrillo*, 156 Ariz. 125, 137, 750 P.2d 883, 895 (1988).

During the first interrogation, the detectives lied to the Defendant, telling him that the lab report revealed that his fingerprints were on the Blazer used in the robbery and that the Whataburger clerk had identified him as the robber. Because "courts will tolerate some form of police gamesmanship so long as the games do not overcome a suspect's will and induce a confession not truly voluntary," *State v. Tapia*, 159 Ariz. 284, 289, 767 P.2d 5, 10 (1988), the misrepresentations are not per se impermissible. They are, however, part of the mix that must be considered in assessing whether the Defendant's will was overborne.

The critical fact, however, is that the detectives' promises and threats caused the Defendant to confess. A confession "obtained by any direct or implied promises, *however slight*," is involuntary. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976); *State v. Williams*, 136 Ariz. 52, 56, 664 P.2d 202, 206 (1983). Three times the detectives told the Defendant that if he cooperated they would tell the county attorney, the judge, and the parole officer that he had been cooperative. They told him that his cooperation "matters on the amount of time you get," and that "we can hopefully limit some of that time."

The "however slight" language in *Hutto* has not been literally applied in every context. Police may offer to tell the prosecutor about the defendant's cooperation and suggest that such cooperation may increase the likelihood of a more lenient sentence. *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir.1994) (citing *United States v. Willard*, 919 F.2d 606, 608 (9th Cir.1990)); *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988); *Tapia*, 159 Ariz. at 290, 767 P.2d at 11; *State v. Hall*, 120 Ariz. 454, 456–57, 586 P.2d 1266, 1268–69 (1978). So long as the promise is "couched in terms of a mere possibility or an opinion," the promise is generally not sufficient to render a confession involuntary. *State v. McVay*, 127 Ariz. 18, 20, 617 P.2d 1134, 1136 (1980).

While the detectives' representations that the Defendant's cooperation would be communicated to the prosecutor were per-

missible, that was not all they told him. They repeatedly told him that if he did not confess they would make it harder on him. "Threatening to inform the prosecutor of a suspect's refusal to cooperate violates her fifth amendment right to remain silent." *Leon Guerrero*, 847 F.2d at 1366 n. 2; *United States v. Tingle*, 658 F.2d 1332, 1336 n. 5 (9th Cir.1981). Furthermore, "promises that officers would see to it that a defendant would go to prison if he failed to cooperate" are not permissible. *Tapia*, 159 Ariz. at 290, 767 P.2d at 11. *Cf. State v. Ross*, 180 Ariz. 598, 603–04, 886 P.2d 1354, 1359–60 (1994) (statement by police that they could go to court to prove intentional murder was not an impermissible threat where police did not imply that defendant would receive lesser punishment if he confessed to felony murder where defendant knew punishment for both crimes was the same).

 *Harrison*, 34 F.3d 886, is a very recent case on point in which federal agents arrested a woman at her house, read her her rights, and began to question her. *Id.* at 890. The agents told the woman about the evidence against her, informed her of the prison time she might be facing, and then asked her "whether she thought it would be better if the judge were told that she had cooperated or had not cooperated." *Id.* The defendant responded that it would be better if she cooperated and then made an incriminating statement. *Id.* The court found that the suggestion that the agents might inform the court that she had not cooperated was improper. *Id.* at 891. In distinguishing the improper statements made by the agents from acceptable statements, the court stated:

> Although it is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the

statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.

*Id.* (quoting *Tingle*, 658 F.2d at 1336 n. 5). The court recognized that the distinctions between police activities which are permissible and those which are taboo are very subtle and subject to confusion. *Id.* at 891. While statements that cooperation may benefit the defendant and statements that lack of cooperation may result in harsher treatment may appear to be two sides of the same coin, they are not entirely interchangeable. *Id.* The court stated that the first kind of statement may be of some benefit to the defendant from learning of the possibility of reduced sentences. *Id.* at 891–92. The second kind of statement, however, has no legitimate purpose and can only be intended to coerce. *Id.*; *Tingle*, 658 F.2d at 1336 n. 5; *Collazo v. Estelle*, 940 F.2d 411, 416–19 (9th Cir.1991), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992). A defendant should not be penalized for exercising his rights. *See Carrillo*, 156 Ariz. at 131, 750 P.2d at 889. The court in *Harrison* concluded:

> [T]here are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor. *"[T]he admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne."*

34 F.3d at 891–92 (quoting *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985)); *see also Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964) (no penalty may be imposed for remaining silent).

The detectives told the Defendant that if he didn't cooperate, they would ask for a "lot of jail time," and said that if he did not cooperate they could make it "real uncomfortable." When he refused to talk, they told him that they were going to "file their recom-

mendation that he was uncooperative." When they terminated the first interrogation, the very last thing they said to him was that it was never too late to confess to avoid their recommendation that he be treated as uncooperative. Shortly after that, the Defendant asked to talk to them, but this second interrogation had to wait until after the initial appearance.

The trial judge never drew a clear distinction between permissible discussion of the possibility of leniency in return for cooperation and impermissible threats. He therefore applied the wrong law to the question before him. The trial judge's observation that the threats were permissible because they were true undercuts his ultimate ruling. The truth of the threats only strengthens their coercive effect.

■ Contrary to another of the trial judge's conclusions, nothing that occurred after the threats dispelled their effect. To determine whether coercive pressures have been dispelled we undertake an independent examination to see if there was a break in the stream of events sufficient to insulate the confession from the effect of everything that preceded it. *Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967). It is appropriate to consider in this regard, among other things, how much time elapsed between the application of the constitutionally impermissible pressure and the confession, whether there was any change in the place of interrogation, and whether there was a change in the identity of the interrogators. *Oregon v. Elstad,* 470 U.S. 298, 310, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985). All of these factors militate in the Defendant's favor.

The case of *State v. Emery,* 131 Ariz. 493, 642 P.2d 838 (1982), further elucidates the law on this subject and applies it to facts similar to those before us. In *Emery,* the defendant and a confederate were charged with murder. *Id.* at 496, 642 P.2d at 841. The defendant was arrested and held in an isolation cell for about six hours before he was given his *Miranda* warnings and questioned by detectives. *Id.* The defendant, when advised that his co-defendant had told the detectives that the defendant had taken

part in several killings, said that he wanted a lawyer. *Id.* The interview terminated, but forty-two minutes later it resumed at the request of the defendant. *Id.* at 497, 642 P.2d at 842. The defendant testified that he asked to talk to the detectives because he had "overheard" a conversation between them in which they discussed that it was too bad that the defendant would have to take the entire blame for the murders and that he would wind up in the gas chamber. *Id.* The trial court denied the defendant's motion to suppress his confession. *Id.*

■ The Supreme Court of Arizona reversed. It observed that a confession may be inadmissible as involuntary for one of three reasons: "(1) impermissible conduct by police, (2) coercive pressures not dispelled, or (3) confession derived directly from prior involuntary statement." *Id.* at 502, 642 P.2d at 847. The supreme court was suspicious of the assertion that the defendant in *Emery* had initiated the second interrogation but it said that, even if he had, his confession should have been suppressed because the state had not met its burden of proving the voluntariness of the statement obtained after the defendant had invoked his right to counsel. *Id.* at 502–03, 642 P.2d at 847–48. The court found that in discussing the death penalty in the presence of the defendant, the detectives engaged in impermissible conduct which mandated a finding that the confession was involuntary. *Id.*

■ The case before us is similar. The police threatened the Defendant and their parting comment when he would not confess was to tell him that, "it was never too late." Very shortly thereafter, the Defendant wanted to talk to the detectives but they had to take him to the initial appearance. At that point, his will had been overborne. The fact that the Defendant then saw a judge who advised him of his rights adds little to the State's case. The Defendant had already seen one of those rights—the right to cease the interrogation—completely ignored. Nor did the judge know that the Defendant had been threatened by the police and, hence, could have said nothing specific that might have dispelled those threats. The detectives

did nothing to withdraw or retract their threats. The cause and effect are obvious, and we do not believe the evidence will support any other conclusion. *See Harrison*, 34 F.3d at 891–92; *Tapia*, 159 Ariz. at 290, 767 P.2d at 11; *State v. Thomas*, 148 Ariz. 225, 227–28, 714 P.2d 395, 397–98 (1986).

The dissent cites *Amaya–Ruiz* for the proposition that a confession is rendered involuntary as the result of an express or implied promise only if the defendant relied on the promise in making the confession. *Id.* at 165, 800 P.2d at 1273. In *Amaya–Ruiz*, the court was concerned with the effect of alleged promises as opposed to the effect of threats. Assuming an analogy between the two, however, the court in *Amaya–Ruiz* did not say that there had to be explicit proof in the form of testimony from the defendant himself that he had relied on promises by the police in making his confession. In *Amaya–Ruiz*, the link between the supposed promises and the defendant's confession was not nearly as obvious as is the link in this case between the refusal to cease questioning and the threats on the one hand and the confession on the other. So, too, in *Amaya–Ruiz*, the court had no need to examine any reliance on the supposed promises made by a

police officer because it found that the officer's statements were not promises at all. *Id.* Nor does *Amaya–Ruiz* address the rule that "any statement taken after the person invokes his privilege *cannot be other than the product of compulsion*, subtle or otherwise." *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) (emphasis added).

■ We view *Amaya–Ruiz* as nothing more than a restatement of the rule that a court must look to all of the circumstances surrounding a confession or confessions in determining whether the Defendant's will was overborne. Here, even in the absence of an explicit statement by the Defendant at the hearing on the motion to suppress that he confessed because the detectives persisted in questioning him and threatened him, that conclusion is inescapable on this record. The State had the burden of proof on this point, and it came forward with nothing to suggest anything but that the detectives' impermissible tactics bore fruit.

■ Our conclusion is bolstered by the Defendant's testimony at trial in which he explained why he confessed.[3] Much of what he said related to the supposed promise

**3.** The fact that the Defendant did not testify at the voluntariness hearing does not mean that he is not entitled to relief now. Most of the improper statements made by the detectives were elicited at the hearing. The trial judge did not recognize that the refusal to honor the Defendant's right to remain silent and the threats to inform the prosecutor of the Defendant's refusal to cooperate were improper. The evidence presented at the hearing alone compels the suppression of the confessions. Even if this were not the case, the scope of review is not restricted to what happened at the voluntariness hearing. If the "involuntariness of a confession is conclusively demonstrated at any stage of a trial, the defendant is deprived of due process by entry of judgment of conviction without exclusion of the confession." *Blackburn v. Alabama*, 361 U.S. 199, 210, 80 S.Ct. 274, 282, 4 L.Ed.2d 242 (1960).

The dissent cites *West Virginia v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994), for the proposition that if the defendant does not renew the motion to suppress at the end of the trial he cannot, on appeal, refer to the trial record to support his argument that the trial court erred in denying his motion to suppress. Assuming that *Farley* is correct, we believe that the trial record is properly before us. As the dissent notes, even

if a defendant did not renew his pretrial motion to suppress, we must still review the case for fundamental error. The dissent says that even if the confessions should not have been admitted, no fundamental error occurred because the jury found that they were voluntary. The proper procedure for weighing voluntariness is set out in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The threshold voluntariness inquiry is for the court and the defendant can reargue the matter to the jury. Considering *Jackson* and *Blackburn* together, it is clear that when it appears at any stage of the proceedings that a confession is involuntary, it is the trial judge's duty to exclude it from evidence. For all the reasons we have set forth in this opinion, we believe that the admission of the Defendant's confessions which followed repeated refusals to honor his invocation of his right to remain silent and which were based on threats constitutes a denial of due process and is fundamental error. If that were not enough, and again assuming that *Farley* should apply, we can posit no reason for defense counsel's failure to renew the motion to suppress at trial. His failure to do so would raise more than a colorable claim of ineffective assistance. It would, in fact, be ineffective assistance of counsel and the Defendant would be entitled to a new trial on that ground.

that if he confessed to the robberies, he would not be prosecuted for them. In that respect, some of what he said is not relevant to our inquiry. His explanation is somewhat rambling. It is clear enough, however, to demonstrate that the refusal to stop the questioning and the threats of what would happen if he did not cooperate played a major part in procuring his confession. The exchange on this point was as follows:

A (By Defendant): At that time, all kinds of things were running through my head. And I guess in a way I was figuring that if I go ahead and tell the detective what he wanted to hear, then when I go to court, okay, then I will have them saying that yeah, he cooperated. Okay.

So he asked me again, did I do the armed robbery and I told him yes. That was off tape.

. . . .

Q (By attorney for the defense): And, then, what did they ask you and what did you tell them in the last interview?

A: Well, they went to start questioning me again and I was wondering why did I have to turn around and talk to them again. . . .

I remember them telling me that we have to put up with this bullshit again. At that time I felt compelled, you know, tell him whatever he wants to hear. . . .

And I just turned and said, well, I'll answer your questions. I figured what harm would it do then. I had told him—confessed to everything which was off tape. So I was maybe relying on promises. I did not even know why he was going over the Miranda rights again.

. . . .

Q: Had you actually robbed anything on the 23rd of April of 1991?

A: No.

Q: Why did you tell him, then, that you had?

A: I told him that because I had already stated that I had did the armed robberies. So at that time, I was basically just going on dealing on my back and get it over with. I was just—

Q: At the time that you told him that you committed the armed robberies, was this about 16 or 17 hours after your arrest?

A: I think you could say that.

Q: You already said that you hadn't had any sleep during that period of time.

A: Right.

Q: And you told the officer you were contemplating suicide during that period of questioning?

A: Yeah, I guess I did. Because I guess it just got to me, the situation because, you know, the way they were putting pressure on me. I knew for a fact that I had priors, you know. And I knew that the way things were going to, telling me I was going to do a long time, all this, if I didn't cooperate. And I guess that's the reason I went into that.

Q: Did you tell the officer during questioning that you didn't want to answer any more questions?

A: Yeah.

Q: Did he continue to ask you questions?

A: I specifically told them to leave me alone. It was, again, on the first tape. I told him I did not want to answer any more questions, and he turned around and kept talking to me.

And, you know, so—and when he kept talking to me, I, again, felt compelled to sit there and talk to them. After all I had told him, what was the difference. So I indicated I didn't want to talk to him. I was, like, I don't know how many times I told him I didn't want to continue talking. After I told him, leave me alone. And when I got to the point where I didn't tell him I didn't do it. I was fucking everyone, man.

And, you know, after, I don't give a shit about anything anymore. It's like that.

Q: Were both officers asking you questions during this period of time?

A: Detective Adams, when it came to their asking me about the car, Detective Adams then was stepping in and was asking more questions about the car. And the second detective, Schoch, was wanting to

know more or less about the armed robberies.

And just finished up on the second tape. What happened on the second tape, I admitted to those other three armed robberies that happened the month before. And when I admitted to those, he was just, you committed them in the same way. I was just saying yes to everything, yes I did this, yes I did that, so forth and so on.

And he, like, you admitted earlier that you were in a stolen vehicle. You know, I said yes, which was true. I told the officer as soon as I was stopped, you know, that it could possibly have been stolen anyway, you know, which is true. But I didn't know it was stolen, you know, before I entered it. I found out it was stolen once I was already in the vehicle making a right-hand turn.

Same for the Blazer where I did not know it was—the Blazer was even stolen. I had been riding around in it the whole night and I didn't know the Blazer was stolen.

The whole—like I say, the only reason I turned around and admitted to any of it was because Detective Adams made me promises.

### THE REFUSAL OF THE POLICE TO HONOR THE REQUEST TO STOP THE INTERROGATION PLAYED A PART IN SECURING THE CONFESSIONS

■ The refusal of the officers to stop the questioning on request is a part of the totality of circumstances we examine to determine if the Defendant's will was overborne. Because the State argues that the detectives did not refuse to honor an unambiguous request to stop the interrogation, it is necessary to examine the law as it relates to this question in detail. The basic law is simple.

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.* Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28 (emphasis added). A suspect's right to cut off questioning must be "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); *State v. Bravo,* 158 Ariz. 364, 368, 373, 762 P.2d 1318, 1322, 1327 (1988), *cert. denied,* 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989) ("well, I don't wanna answer any more questions" required immediate cessation of interrogation).

A review of the first interrogation shows that, on at least one occasion, the Defendant clearly told the officer that he wanted the questioning to cease. He said, "Well I don't want [to] answer anymore." Clearly, questioning should have stopped at this point. Later, on at least two other occasions during this first interrogation, the Defendant indicated that he was not going to answer questions, and he also told the detectives to "get me out of here man. I'm going back to the fucking jail. That's all . . . ." He further told the detectives that he wasn't going to "talk worth a shit anyway" and that he had told them all he knew. In each instance the detectives ignored the Defendant's statements and either continued questioning him directly or changed the topic and proceeded as if he had not indicated that he did not want to answer any questions.

The State asserts that the Defendant's invocation of his right to remain silent was ambiguous. The trial court, in ruling on whether the Defendant had invoked his right to remain silent, said:

[A]fter [the Defendant] said that, there was a diversion. He wasn't asked specifically about the matter and it seemed like the conversation was flowing rather than the officer acting in bad faith or derogation of a clearly invoked right: I don't want to talk anymore; leave me alone. If that had been clearly stated and the officer had

continued to soften him up, I'd have some real concern.

 We disagree with the State and the trial court. The Defendant's first invocation, "Well I don't want [to] answer anymore," could not have been clearer. The additional words "I mean I'm in, fuck it. ____ I'm going to have a fucked up life" do nothing to confuse or detract from the idea that the Defendant did not want to answer any more questions. His other repeated indications that he did not want to answer questions, if less clear, were clear enough. In *Davis v. United States*, ___ U.S. ___, ___, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994), regarding the closely related issue of a defendant's request for an attorney, the Supreme Court stated that a suspect need not articulate his request with precision so long as he does it "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." The Defendant certainly articulated his request sufficiently clearly for the detectives to understand what he meant. Detective Adams demonstrated that he understood that the Defendant had invoked his right to remain silent when the detective said, "Ok so you figured this whole thing is fucked and *that's why you don't want to tell us about the robbery or anything else,* right?" If this were not enough, Detective Adams also testified as follows at trial:

Q (by the prosecutor): What did you do in response to Mr. Strayhand's saying something along the lines that he didn't want to talk anymore or anything like that?

A: We kind of changed the subject and asked him other things and came back to it.

Q: When you changed the subject did he appear more or less willing to talk to you still?

A: Yes, he was more willing to talk to me about different things.

Q: Then when you revisited the discussions about either the robberies or the car thefts was he then willing to talk to you again?

A: He would start clamming up again or not be so willing to talk.

Detective Adams obviously understood the Defendant's intentions, but he simply ignored them by creating a diversion. Detective Schoch testified at trial that he does not believe that the right to remain silent has been invoked unless a suspect "tells me he wants to see a lawyer now or I want to see my lawyer." Detective Schoch apparently did not recognize that the right to remain silent is separate and distinct from the right to counsel.

There are several Arizona cases on this point that merit discussion. In *Bravo,* it was conceded that the defendant's statement, "Well, I don't wanna answer any more questions," was a clear invocation of his right to remain silent and the fact that the officers continued questioning "was a clear violation of black letter *Miranda* law." *Id.* at 368, 373, 762 P.2d at 1322, 1327. The Defendant's statement in this case is almost identical to the defendant's statement in *Bravo* ("Well I don't want [to] answer anymore," compared to "Well, I don't wanna answer any more questions"). It is very clearly an invocation of his right to remain silent. Yet, the detectives continued questioning him and, therefore, violated his *Miranda* rights.

In *State v. Zimmerman,* 166 Ariz. 325, 802 P.2d 1024 (App.1990), the defendant stated, "That is all I want to say. I am tired." *Id.* at 330, 802 P.2d at 1029. The officer responded to the defendant's statement by reminding the defendant of his rights, stating his preference to get questioning over with, and asking if the defendant would continue. *Id.* The defendant replied, "Yes." *Id.* The court in *Zimmerman* held that the defendant's statement was an ambiguous invocation because "[i]t was unclear whether he did not want to answer any more questions, period, or whether he was just tired and would answer questions after a break." *Id.* The officers clarified his intent and then continued questioning. *Id.* In contrast to *Zimmerman,* the Defendant's first invocation, "Well I don't want [to] answer anymore," is very clear. The rest of his statement does not suggest in any way that he was willing to answer questions.

After the Defendant invoked his right to remain silent, the detectives turned the questioning to the Defendant's personal problems and, soon afterward, returned to questioning

him about the crimes. The conversation was "flowing," as the trial judge put it, only because the detectives made it flow despite the fact that, as Detective Adams later acknowledged, they clearly understood that the Defendant had invoked his right to remain silent. It is clear beyond any quibble that these detectives chose not to "scrupulously honor" the Defendant's right to cut off questioning as required by *Mosley* and *Bravo*. *Mosley*, 423 U.S. at 104, 96 S.Ct. at 326; *Bravo*, 158 Ariz. at 373, 762 P.2d at 1327.

 Even if we were to concede, for the sake of argument, that there was any ambiguity in the Defendant's invocation of his right to remain silent, the confession would still not be admissible. In *State v. Finehout*, 136 Ariz 226, 229, 665 P.2d 570, 573 (1983), the supreme court said:

[E]ven if the defendant's assertion is susceptible to more than one interpretation, the limit of permissible continuing interrogation immediately after the assertion would be for the sole purpose of ascertaining whether the defendant intended to invoke his right to silence, or to waive this right.

(Citation omitted.) *Accord Zimmerman*, 166 Ariz. at 330, 802 P.2d at 1029; *State v. Clemons*, 27 Ariz.App. 193, 196–97, 552 P.2d 1208, 1211–12 (1976). Detectives Adams and Schoch ignored the Defendant and briefly changed the topic but soon came back to the subject of the robberies. They did not attempt to clarify the Defendant's intent and, after they had returned to the topic of the robberies, they also ignored the Defendant's later remarks "I'm not going to talk worth shit anyway so it doesn't matter to me," and "well get me outta here man, I'm going back to the fucking jail. That's all . . . ."

We are aware of the holding of the United States Supreme Court in *Davis* to the effect that there is no requirement under the United States Constitution that officers clarify an ambiguous request for counsel before proceeding with questioning. *See Davis*, —— U.S. at ——, 114 S.Ct. at 2356. In *State v. Eastlack*, 180 Ariz. 243, 250–51, 883 P.2d 999, 1006–07 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1978, 131 L.Ed.2d 866 (1995), our supreme court applied the rule of *Davis* in

the context of a purported request for counsel. Arguably, *Davis* undercuts the rule laid down in *Finehout* although *Davis* did not deal with the Fifth Amendment guarantee against self-incrimination. Unless the Supreme Court of Arizona changes the law, we will continue to follow the rule of *Finehout*.

Keeping in mind that the question whether a confession is voluntary must be decided upon the totality of circumstances, we believe that the flagrant refusal of the officers to honor the Defendant's repeated requests to remain silent had a significant effect on procuring his confession. The detectives recited the litany of rights and then ran roughshod over them. This is coercive in itself. Further, had the officers honored the Defendant's request, the dialogue which led to and included the threats would never have taken place.

 Finally, it is appropriate to examine "the purpose and flagrancy of the official misconduct," which led to the confession. *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975).

The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.

*Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974).

 While the police misconduct in this case may not be as shocking as the use of physical coercion would be, it was nonetheless a very deliberate violation of *Miranda*. As Justice Moeller said in *Bravo*:

The violation in this case did not occur in any murky, ill-defined area of law where reasonable persons could differ on *Miranda* application. This was a clear violation of black letter *Miranda* law known to all qualified police officers.

*Id.* at 373, 762 P.2d at 1327. It is appropriate to apply the exclusionary rule under these circumstances.

### HARMLESS ERROR REVIEW

The admission of an involuntary statement must be reviewed for harmless error. *Arizona v. Fulminante,* 499 U.S. 279, 284–85, 111 S.Ct. 1246, 1250–52, 113 L.Ed.2d 302 (1991). A constitutional error mandates reversal unless the state proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The State does not argue that admission of the confessions was harmless. The confessions lend considerable strength to the case against the Defendant. The fingerprint that appears on the vehicle used in the robberies is not inconsistent with the Defendant's version of events, and the identification evidence was not especially strong. While the Defendant's version of events seems contrived, the confessions are "probably the most probative and damaging evidence that can be admitted against" him and "may tempt the jury to rely upon that evidence alone in reaching its decision." *Fulminante,* 499 U.S. at 296, 111 S.Ct. at 1258. Even if the State had a strong case without the confessions, "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession." *Jackson,* 378 U.S. at 376, 84 S.Ct. at 1780. The State has failed to sustain its burden of proving that the use of the Defendant's confessions during the trial was harmless error. *See Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

### THE DEFENDANT IS ENTITLED TO A MERE PRESENCE INSTRUCTION ON RETRIAL

We will discuss the other issues raised by the Defendant on appeal which may recur on retrial. The Defendant contends that the trial court committed reversible error by refusing to give the following jury instruction:

Guilt cannot be established by a defendant's mere presence at a crime scene or mere association with another person at a crime scene. The fact that a defendant may have been present does not, in and of itself, make a defendant guilty of the crime charged.

The Defendant testified that he was merely a passenger in the Chevrolet Blazer and that a friend, Dee, was the person who drove the vehicle and who robbed the Whataburger on June 20, 1991. The trial court recognized that the Defendant could argue mere presence as a defense, but that absent a charge of accomplice liability, it did not need to instruct the jury on mere presence.

A defendant is entitled to an instruction on any theory of defense which is recognized by law and supported by the evidence. *State v. LaGrand,* 152 Ariz. 483, 487, 733 P.2d 1066, 1070 (1987), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). When a defense theory is reasonably supported by the evidence, failure to instruct as to that theory is reversible error. *State v. Celaya,* 135 Ariz. 248, 253, 660 P.2d 849, 854 (1983). We will not, however, reverse a conviction based on a trial court's ruling on a jury instruction unless we can reasonably find that the instructions, when taken as a whole, would mislead the jurors. *See State v. Schrock,* 149 Ariz. 433, 440, 719 P.2d 1049, 1056 (1986).

There was a legal basis for a mere presence defense in this case. The fact that a defendant was present at the scene of a crime with knowledge of what was happening does not make him guilty of the crime. *State v. Green,* 117 Ariz. 92, 94, 570 P.2d 1265, 1267 (App.), *aff'd in part, modified in part by,* 116 Ariz. 587, 570 P.2d 755 (1977). The mere presence of a person at the time and place of a crime does not make him an aider, abettor, or principal. *State v. Hernandez,* 112 Ariz. 246, 247, 540 P.2d 1227, 1228 (1975). We know of no law which requires a defendant to be charged as an accomplice before a mere presence instruction can be given.

The Defendant's version of the facts as they appear in the record also supports his mere presence defense. While a Defendant must show more than a mere scintilla of evidence, an instruction must be given if

there is evidence upon which the jury could rationally sustain the defense. *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984). The Defendant told a story that added up to his mere presence at the Whataburger robbery on June 20. Whether his version was true was an issue for the jury, and, therefore, the jury should have been instructed on that defense. *See id.*

We do not believe that *State v. Shields*, 26 Ariz.App. 121, 546 P.2d 846 (1976), which the dissent relies on, compels a different result. We note first that the instruction requested in *Shields* was not a correct statement of the law because it told the jury that presence at the scene of the crime is not *evidence* of guilt. That aside, however, the court in *Shields* seems not to have considered the potential for confusion that might be created absent a mere presence instruction when the defendant asserts that a companion was the sole culprit.

Under the rule of *Schrock*, failure to give the mere presence instruction might not, without more, justify a reversal. If the State retries the Defendant on this charge and the evidence is substantially the same as it was at the first trial, this instruction should be given.

### THE PHOTOGRAPHIC LINEUP WAS NOT UNDULY SUGGESTIVE

■ The victim of the first robbery identified the Defendant in a photographic lineup approximately one month after the robbery. She also identified the Defendant in court.[4] The Defendant argues that the trial court erred by allowing evidence that was impermissibly suggestive because the Defendant's photograph was lighter than the other five photographs and because it appeared that the Defendant's face was highlighted by a spotlight.

■ The question at the heart of this issue is whether the lineup created a substantial likelihood of misidentification by unfairly focusing attention on the person that the police believed committed the crime.

*State v. Fierro*, 166 Ariz. 539, 545–46, 804 P.2d 72, 78–79 (1990). An identification procedure, however, does not create a substantial likelihood of misidentification merely because of subtle differences between photographs. *State v. Perea*, 142 Ariz. 352, 356, 690 P.2d 71, 75 (1984).

Here, the police showed the victim six photographs. They admonished her that a photograph of the person who committed the crime might not be in the lineup and that features such as facial hair are easily changed. Nothing about the manner or sequence in which the photographs were displayed was suggestive.

The trial court recognized that the Defendant's photograph was lighter than the other photographs, but it also found that other photographs also differed in lightness. Further, the court found that other photographs also were unique in other ways. For example, some of them were more revealing as to a subject's eyes or showed people who were more intense looking. Consistent with *Perea*, the trial court held that these subtle differences in the photographs did not make the photographic lineup unduly suggestive. *See id.*, 142 Ariz. at 356, 690 P.2d at 75. We have reviewed the photo lineup, and we agree with the trial court that it was not unduly suggestive.

### MOOT ISSUES

The Defendant urges that his motion for acquittal should have been granted because, without the confessions, the evidence was insufficient to support the convictions. This will have to be decided on the basis of the record in the new trial. The issue regarding an enhanced sentence may not arise again. The issue raised with respect to the judge's comment about a possible appeal in the presence of the jury will not recur on retrial.

For the foregoing reasons, the convictions for robbery and the theft of the Blazer are reversed and sentences vacated. This case is remanded to the trial court for further pro-

---

4. The clerk from the second robbery could not identify the Defendant in the photographic lineup. The clerk from the third robbery testified that she could not identify the Defendant as the robber at a show-up identification approximately thirty minutes after the robbery. That clerk never viewed the photographic lineup.

ceedings as to those charges. The conviction and sentence for the theft of the station wagon and the order revoking probation are affirmed.

GRANT, J., concurs.

McGREGOR, Presiding Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's holding that the trial judge committed clear and manifest error in admitting testimony about defendant's confessions and that admitting such testimony constitutes reversible error. In my view, the majority's conclusions depend upon a review of the record that takes all facts in the light most favorable to overturning defendant's convictions and that substitutes this court's factual findings for those of the trial judge. Both these approaches contravene established principles. *See State v. Lucas*, 146 Ariz. 597, 607, 708 P.2d 81, 91 (1985) (this court reviews trial court's ruling on admissibility of confessions for clear and manifest error); *State v. Atwood*, 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992) (this court must take all facts in light most favorable to affirming defendant's convictions), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

The trial judge's findings support his decision to admit testimony about defendant's confessions if we apply any of three accepted legal analyses. The trial judge applied the appropriate legal test by considering the totality of circumstances to determine whether defendant's confessions were voluntary. Included within that general legal test are two more specific analyses that apply to the facts of this case. The first more specific analysis involves the principle that threats by law enforcement personnel render an admission inadmissible only if the defendant relied upon the threats, i.e., if the threats caused the defendant to confess. The second more specific analysis, which provides another means to test the causal relationship between threat and confession, considers whether a break between the allegedly coercive activities and the confession was sufficient to dispel any coercive effect and thereby render the admission voluntary. Applying any of those analyses, I would conclude that the trial judge's

findings support his holding that defendant's confessions during the evening interview were not causally related to any improper police conduct and the trial judge therefore did not commit clear and manifest error in finding the statements admissible.

## I.

To place events in proper perspective, I believe a short summary of the various proceedings will be helpful. I restate the facts revealed by the record, taken in the light most favorable to sustaining the convictions.

### Chronology

Mesa police officer Reichert arrested defendant, who was seen running from the scene of the last armed robbery and who was driving a tan station wagon at the time of his arrest, at approximately 2:00 a.m. on June 20, 1991. The officer explained defendant's *Miranda* rights to him, after which defendant said he knew the station wagon must have been stolen. The police transported defendant to the police station, where he arrived at approximately 3:00 a.m. Defendant remained in a holding cell, which included a bench on which he could lie down, until 12:45 p.m. At trial, defendant testified that the Mesa police station was "too cold" to allow him to sleep during that summer night. During that time period, according to defendant, the police served him "some meal, but, you know, I wasn't in the mood for eating."

Detectives Schoch and Adams conducted two interviews with defendant on June 20, 1991, both of which were tape recorded. The afternoon interview involved two sessions, separated by a break of five to fifteen minutes. The first portion of the afternoon interview lasted from 12:45 p.m. until approximately 1:50 p.m. This court has neither a tape recording nor a transcript of that session. At the start of the first session, Detective Schoch repeated standard *Miranda* warnings. The parties agree, and the majority recognizes, that defendant admitted theft of the station wagon during that portion of the afternoon interview. The second portion of the afternoon interview lasted from 2:05 p.m. until 3:00 p.m. During that portion,

defendant accepted a soda and a muffin from the officers. Defendant made no inculpatory statements during the second portion of the afternoon interview.

The evening interview, for which this court has neither a recording nor a transcript, began at 6:16 p.m. At the start of the evening interview, defendant again received *Miranda* warnings. During that interview, he admitted the two automobile thefts and three armed robberies. The interview lasted for approximately forty-five minutes, the last twenty minutes of which were consumed when the detectives drove defendant to the location at which he said he discarded the clothing he wore in the armed robberies committed on June 20, 1991.

Between the afternoon and evening interviews, several events transpired. At approximately 5:00 p.m., defendant made his initial appearance before a judge on the theft charges. Defendant testified at trial that the trial judge again explained his right to counsel and to remain silent. Defendant spoke with his probation officer after his initial appearance. He later asked to speak again with the detectives. Three-and-one-quarter hours after the afternoon interview ended, defendant's evening interview began.

Two crucial facts are central to the analysis of this case and deserve emphasis. All the questions and comments on which the majority relies to determine that defendant's confessions were involuntary occurred during the second portion of the afternoon interview, during which defendant made no admissions. All the inculpatory statements that the majority would exclude occurred during the evening interview, when no allegedly coercive police activity took place.

### Exclusionary Hearing

In response to defendant's motion to suppress testimony about his confessions, the trial judge conducted a voluntariness hearing. Only Detective Schoch testified at the hearing. During the hearing, the trial judge listened to a portion of the tape recording of the second portion of the afternoon interview and admitted the recording into evidence. At the close of the hearing, defense counsel indicated that he did not intend to question

the admissibility of defendant's statement in the first interview that he knew the station wagon was stolen. The trial judge then made his initial findings, including (1) the interviews were custodial interrogations; (2) defendant was not in any way mistreated and was free to move around the interview room; (3) the detectives explained and defendant understood his rights; (4) defendant agreed to provide information without any real hesitancy; (5) the questioning took place in a noncoercive manner, without promises or threats of any kind being made, at least until the first break; (6) defendant clearly was not overcome as a result of police coercion, at least until the point that reference may have been made to cooperation; (7) during the evening interview, the detectives clearly admonished defendant that the interview would end if he wanted an attorney; (8) defendant was lucid, not overtired, and not under the influence of drugs or alcohol. The trial judge then indicated that he wished to further consider the effects of the alleged promises or threats.

The trial judge subsequently made additional findings, based upon his review of the interview transcript and tape recording, his consideration of the demeanor of Detective Schoch, and his attention to "the tone of voice, demeanor and all the facts and the totality of the circumstances that surrounded the interrogation of Mr. Strayhand at the Mesa police department...." The trial judge found that, "under the totality of circumstances, the Court cannot conclude that the defendant's will was overborne or overcome by the heavy-handedness of the police, by any promises implied or express, or that it was a result of threats." Accordingly, the trial judge ruled that testimony about all defendant's statements to the police was admissible, stating that the jury independently would assess whether the statements were voluntary beyond a reasonable doubt.

### Trial Testimony

At trial, Detectives Schoch and Adams testified about the interviews and the circumstances surrounding defendant's confessions, as did defendant. The trial judge instructed the jury as follows:

You must not consider any statements made by the defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the defendant made the statements voluntarily.

A defendant's statement was not voluntary if it resulted from the defendant's will being overcome by a law enforcement officer's use of any sort of violence, coercion, or threats or by any direct or implied promise, however slight.

The jury returned guilty verdicts on all counts.

## II.

The central question in this appeal is not whether the detectives threatened defendant during the afternoon interview.[5] The central question is whether, even assuming misconduct occurred, the trial judge clearly and manifestly erred in concluding that the police misconduct during the afternoon interview did not result in defendant's will being overborne and did not cause him to confess during the evening interview. I would not find the circumstances upon which the majority relies sufficient to compel a finding that defendant's confessions were involuntary.

## A.

"Confessions are presumed to be involuntary." *State v. Amaya–Ruiz,* 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). In determining whether a confession is voluntary, the trial court must determine whether the state has shown, by a preponderance of the evidence, that a confession presumed to be involuntary was voluntarily and freely given. *Id.* In considering the voluntariness of a confession, no single factor is determinative; the trial court must consider the totality of circumstances surrounding the confession. *Id.* This court reviews the trial court's determination for clear and man-

ifest error. *Lucas,* 146 Ariz. at 607, 708 P.2d at 91.

Determining the voluntariness of a confession is by necessity an intensely factual inquiry. The trial court must decide (1) whether the police engaged in improper coercive activity and (2) whether that improper coercive activity was *causally related* to the confession, i.e., whether the interrogee's will was overborne as a result of the coercion. *Colorado v. Connelly,* 479 U.S. 157, 166, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986) (noting need to "recognize the essential link between coercive activity of the State, on one hand, and a resulting confession by a defendant, on the other"). Threatening to inform the court and prosecutor that an interrogee refused to cooperate is improper. *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 n. 2 (9th Cir.1988). Such improper tactics, however, do not alone render a confession involuntary. *Utah v. Mabe,* 864 P.2d 890, 893 (Utah 1993). The court also must find that the confession was causally related to the threat. *Id.*

Because we look to the totality of circumstances, the range of factors we can consider is broad. *See State v. Steelman,* 120 Ariz. 301, 311, 585 P.2d 1213, 1223 (1978) (finding later statements were not derivative of earlier inadmissible statements). To complete its inquiry, the trial court should consider both the characteristics of the interrogee and the details of the interrogation. *United States v. Kelley,* 953 F.2d 562, 565 (9th Cir.1992). The trial judge in this case conducted such an inquiry.

## B.

## 1.

The record shows that the trial judge considered those characteristics of defendant relevant to a determination of whether his confession was voluntary. The trial judge expressly found that defendant was lucid and not overtired, and the transcript shows that defendant understood the questions and re-

---

5. Although the majority describes in some detail those instances it regards as promises and characterizes as critical the "fact" "that the detectives also made promises and threats that caused the Defendant to confess," the majority also recognizes that the "promises" described were "ar-

guably permissible." The majority then relies upon the alleged threats to conclude defendant's confessions were involuntary. I therefore will not address the "promises" made to defendant, which were nothing more than permissible offers to propose leniency.

sponded appropriately. *See Steelman,* 120 Ariz. at 311, 585 P.2d at 1223. The record also shows that defendant consumed a soda and a muffin before the evening interview. *See State v. Lundstrom,* 157 Ariz. 485, 488, 759 P.2d 631, 634 (App.1988) (noting that accommodation of physical needs supported finding of voluntariness), *vacated in part,* 161 Ariz. 141, 776 P.2d 1067 (1989). Defendant understood that he had a right not to speak and that he was a suspect in the thefts and armed robberies. *See Steelman,* 120 Ariz. at 311, 585 P.2d at 1223. Further, this was not defendant's first contact with the police, and he expressed his understanding that the detectives wanted to elicit a confession that they could use against him. *See Utah v. Miller,* 829 P.2d 132, 134–35 (Utah Ct.App.) (discussing defendant's familiarity with legal system and interrogation as factors in totality of circumstances to consider when determining voluntariness of confession), *cert. denied,* 836 P.2d 1383 (Utah 1992).

Moreover, the fact that defendant *made no admissions* during the interview in which the allegedly improper conduct occurred lends substantial support to the trial judge's conclusion that defendant's later statements did not result from police coercion. *See Amaya–Ruiz,* 166 Ariz. at 165, 800 P.2d at 1273. Throughout the afternoon interview, defendant maintained his innocence. As the supreme court noted in *Amaya–Ruiz,* a defendant who steadfastly denies criminal activity is not one whose will has been overborne by investigative authorities. *Id.* Simply put, no matter how inept or egregious, threats simply cannot render a confession involuntary if the threats have no impact on a defendant's activity and do not cause that defendant to confess.

### 2.

I find even less support in the record for the majority's assertion that the trial judge erred in finding the evening confessions were voluntary when I consider the context of the interviews. Defendant had been in custody less than sixteen hours when he confessed and had been free to rest during most of that time. The police did nothing improper by holding defendant in custody, and nothing in the record suggests that the police improperly delayed the interrogation. *See Lundstrom,* 157 Ariz. at 488, 759 P.2d at 634. The police also provided defendant with basic amenities; during his detention, defendant was permitted to rest, offered a meal, and consumed snacks. *See id.* The detectives did not subject defendant to late-night or non-stop interrogation. *See Steelman,* 120 Ariz. at 311, 585 P.2d at 1223. The detectives did not interrogate defendant until the early afternoon. Before the afternoon interview, the detectives advised defendant of his rights. *See id.* (noting that interrogee should be aware of right to refuse to give statement). The trial judge expressly found that the detectives conducted the interviews in a noncoercive manner. Moreover, the afternoon interrogation lasted less than two hours and included a five to fifteen minute break. *See State v. Ross,* 180 Ariz. 598, 603, 886 P.2d 1354, 1359 (1994) (citing *State v. Stanley,* 167 Ariz. 519, 524, 809 P.2d 944, 949, *cert. denied,* 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991) for proposition that "one-and-a-half-hour to two-hour interview" was not extraordinary). During the ensuing three-hour break, discussed in greater detail below, defendant appeared before a judge and spoke with his probation officer. The trial judge specifically found that the time between interviews lapsed "without pressure, without defendant being reminded." After that time without pressure, defendant, not the detectives, initiated the evening interview. *See Steelman,* 120 Ariz. at 311, 585 P.2d at 1223.

### 3.

Because this case involves a definite break between the coercive activity and the confessions, the impact of the break deserves careful consideration. The test to determine whether a confession separated in time from challenged activity is voluntary remains a "totality of circumstances" test. *Steelman,* 120 Ariz. at 311, 585 P.2d at 1223. The primary focus, as the majority recognizes, is whether the break in the stream of events is sufficient to separate the confessions from the coercive activity. *See Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967).

The majority passes lightly over the impact of the break in proceedings, stating, "Contrary to another of the trial judge's conclusions, nothing that occurred after the threats dispelled their effect." *Supra* at 581, 911 P.2d at 587. The majority then cites to three factors considered in *Clewis* to determine whether the break in the stream of events insulated the confessions from prior activities and concludes that "[a]ll of these factors militate in the Defendant's favor." *Id.* The majority's analysis, however, fails to consider the facts specific to this case.

In *Steelman*, an Arizona case much closer factually to this case than is *Clewis*, the Arizona Supreme Court found that the defendant's confession did not derive from an earlier inadmissible statement. The *Steelman* court defined appropriate factors to consider, including whether a definite break occurred between the improper conduct and the defendant's confession, whether the defendant knew he had a right not to make a statement, whether non-stop interrogation occurred, and whether the defendant was overwhelmed and confused. *See Steelman*, 120 Ariz. at 311, 585 P.2d at 1223. When those factors are applied to this record, and this trial judge's findings are examined, the results militate in favor of finding defendant's confessions voluntary.

This trial judge was well aware that a definite break occurred between the "coercive" interview and the confessions. In fact, the break that followed the afternoon interview actually lasted longer than the interview itself. The trial judge found that defendant understood his right not to make a statement and that non-stop interrogation did not occur. He expressly found that defendant was not overwhelmed or confused. Applying the *Steelman* factors provides no support for the majority's conclusion that the trial judge

erred. Moreover, other factors present in this case and not in *Steelman* provide additional support for the trial judge's conclusion. The trial judge also knew that, between the two sessions, defendant made his initial appearance before a judge who again advised him of his rights. The majority, without reference to the record, dismisses the importance of defendant's initial appearance at which he was advised of his right to counsel and to remain silent by a neutral judge. I would not discount the importance of this basic procedure. As the Eleventh Circuit of the United States Court of Appeals has recognized, an appearance before a neutral magistrate can dispel the taint of prior inadmissible confessions. *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1476 (11th Cir.) (holding confession to magistrate was admissible despite taint of prior inadmissible confessions), *cert. denied*, 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992). *Mendoza–Cecelia* noted that the appearance did not resemble interrogation and was not coercive. This record is void of any suggestion that the initial appearance resembled interrogation or was coercive.

The trial judge also noted that the detectives renewed *Miranda* warnings at the start of the evening interview and clearly explained defendant's right to end the interview if he desired counsel. The majority discounts the importance of this information, stating, "The detectives recited the litany of rights and then ran roughshod over them." *Supra* at 586, 911 P.2d at 592. Again, the record does not support the majority's factual conclusion.[6] Notably, Detective Schoch's response to defendant's comment wondering whether he should have a lawyer went well beyond a *pro forma* recitation of his right to counsel.[7] Defendant does not even assert

---

6. I also do not agree with the majority that defendant unequivocally invoked his right to remain silent during the afternoon interview. *See supra* note 5.

7. At the beginning of the evening interview, the following exchange occurred between one officer and defendant:

Officer: I just want you to understand your rights. You have the right to have an attorney here. You don't have to answer questions about the events we're going to talk

about. And you do understand that. I have told you, your parole officer told you, the judge has told you. Do you understand this.

Defendant: I do. I just wonder if it's to my best behalf to have one here.

Officer: Okay. Well, you do have a right to have one here before we question you. If you want one here, we'll end the interview. If you don't want one here, we'll continue with the interview as is. But you do have a

that he did not understand his *Miranda* rights, and the trial judge expressly found that he did understand those rights. A defendant's awareness of the right to remain silent and of the right to counsel are crucial considerations in determining voluntariness. *See Steelman,* 120 Ariz. at 311, 585 P.2d at 1223. Given these facts, I cannot agree with the majority's assumption that the *Miranda* warnings were meaningless.

To support its conclusion that the break in proceedings did not sufficiently dispel any coercive effect, the majority cites *State v. Emery,* 131 Ariz. 493, 642 P.2d 838 (1982). The facts of that case, however, differ significantly from this case. In *Emery,* our supreme court considered a situation in which the police disregarded a defendant's unequivocal invocation of his right to have an attorney present during interrogation. After the defendant asserted his right to have counsel present, the police allegedly discontinued questioning the defendant. The police, however, remained in the room with the defendant and discussed the death penalty and the gas chamber. Ultimately, the defendant "waived" his prior invocation of the right to counsel and made incriminating statements. The trial court admitted the statements, and the defendant appealed that ruling.

*Emery* held that the defendant's waiver was involuntary because the officers' discussion was the "functional equivalent of interrogation" that continued uninterrupted after the defendant invoked his right to counsel. 131 Ariz. at 502, 642 P.2d at 847. Here, unlike *Emery,* we have no "functional equivalent of interrogation" following an unequivocal invocation of the right to counsel or the right to remain silent. *See State v. Tapia,* 159 Ariz. 284, 288, 767 P.2d 5, 9 (1988) (noting *Emery* addressed narrow issue of conversations following interrogee's invocation of right to counsel). Rather, we consider a situation in which a long, definite break occurred between defendant's comment and his later admissions.

More analogous to this situation are the decisions in *Utah v. Mabe,* 864 P.2d 890 (Utah 1993) and *Utah v. Strain,* 779 P.2d 221

(Utah 1989). In *Strain,* the Utah Supreme Court, referring to *Bram v. United States,* 168 U.S. 532, 543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897), recognized that any promise or threat, however slight, renders a confession involuntary and inadmissible. 779 P.2d at 227. *Strain* went on to conclude, however, that the totality of circumstances test prevents application of such a rule even when the police threaten a defendant unless the threats induce the defendant to confess. *Id.*

In *Strain,* the defendant steadfastly maintained his innocence during three hours of interrogation. The following morning, the same officer interrogated the defendant. During the second interrogation, despite the officer's improper threats and promises, the defendant continued to maintain his innocence. That evening, the same officer interrogated the defendant for a third time, and the defendant confessed.

The Utah court recognized that the threats and promises were improper but noted that "[t]here is no testimony of defendant as to what considerations prompted his confession. As earlier stated, while coercive threats and promises were made to him, he also made statements which indicate that the improper statements of the officers did not induce him to confess." Because the trial court had not determined whether the threats and promises induced the defendant to confess, the appellate court remanded the matter to the trial court. *Id.; see also Mabe,* 864 P.2d at 893 (trial court did not err in finding that passage of time dispelled coercive effect of threats).

Here, assuming the officers' statements were threats, defendant similarly resisted the threats when made and maintained his innocence until a subsequent interrogation that defendant initiated later the same day. Unlike *Strain,* however, this record reveals that the trial judge did consider the impact of the alleged threats even though defendant chose not to testify at the voluntariness hearing and found that the confession did not result from any threat. Moreover, defendant testified at trial and despite the majority's char-

right to have one here. And it's up to you to make a decision.

Defendant: Okay. I guess I will just answer your questions.

595

acterization to the contrary, the jury obviously did not regard defendant's testimony as leading to the "inescapable conclusion" that threats induced him to confess. Indeed, nothing in the record suggests that the trial judge clearly and manifestly erred in finding that the officers' threats and promises did not induce defendant to confess.

For those reasons, I would conclude that, even if the officers' statements during the afternoon interview had some coercive effect, events between the afternoon and evening interviews sufficiently dispelled the coercive effect to justify the trial judge's ruling that defendant's confessions at the evening interview were voluntary.

4.

In sum, the totality of circumstances revealed by this record does not justify the majority's statement that the "cause and effect [between the threats and the confessions] are obvious...." Rather, the totality of circumstances reveals the contrary. An experienced trial judge applied the correct legal test and considered appropriate factors. The judge considered whether defendant's confessions were voluntary under the totality of circumstances. *See Amaya–Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272. The trial judge evaluated the police conduct objectively to determine whether the confessions were coerced. *See State v. Conde*, 174 Ariz. 30, 35, 846 P.2d 843, 848 (App.1992). In addition, the trial judge considered the voluntariness issue "in light of what the police should perceive from the objective manifestations of the subject's physical or mental condition." *Id.* (quoting *State v. Carrillo*, 156 Ariz. 125, 137, 750 P.2d 883, 895 (1988)). The judge appro-

priately analyzed voluntariness under A.R.S. section 13–3988 (1989) which directs the trial judge to consider certain factors in addition to police coercion.[8]

Given the trial judge's findings, *all of which find support in the record*, I cannot agree with the majority that the trial judge committed clear and manifest error in ruling that the state proved, by a preponderance of the evidence, that defendant's confessions during the evening interview were voluntary and therefore admissible in evidence.

C.

The majority opinion also fails to address adequately the lack of evidence that defendant relied upon the alleged threats. Again assuming that the officers made improper threats, the trial judge did not err because defendant failed *even to assert* at the voluntariness hearing that he relied upon such threats in confessing.

The law in Arizona is clear. A confession induced by threats or promises is involuntary

if two requirements are met: first, there must be an express or implied promise, and second, the defendant must rely on the promise in making the confession.

*Amaya–Ruiz*, 166 Ariz. at 165, 800 P.2d at 1273.

The majority dismisses the reliance element of *Amaya–Ruiz*, saying, "We view *Amaya–Ruiz* as nothing more than a restatement of the rule that a court must look to all of the circumstances surrounding a confession or confessions in determining whether the Defendant's will was overborne." *Supra* at 582, 911 P.2d at 588. Because our su-

---

8. A.R.S. section 13–3988.B states that:

> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including but not limited to the following:
> 1. The time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment.
> 2. Whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession.

> 3. Whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him.
> 4. Whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel.
> 5. Whether or not such defendant was without the assistance of counsel when questioned and when giving such confession. The presence or absence of any of the factors indicated in paragraphs 1 through 5 of this subsection which are taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

preme court has enumerated two elements of a challenge to the voluntariness of a confession because of police promises or threats, I am inclined to view the second element as more than mere surplusage. Moreover, I conclude that applying the reliance requirement provides a separate basis for upholding the decision of the trial judge.

This case is analogous to *State v. Ross* in which "nothing in the record suggests that [the defendant] relied upon [the officers'] words or even thought he would have a chance at a lighter sentence." 180 Ariz. at 603–04, 886 P.2d at 1359–60. Contrary to the majority's characterization, this is not a situation in which a defendant merely failed to "explicitly state" at the voluntariness hearing that he relied on the officers' statements. This is a situation in which defendant made *no claim at all* that he relied on the officers' alleged threats or promises.

The majority relies on a long passage from defendant's trial testimony to bolster its view that defendant's confessions resulted from his reliance on promises and threats. I regard that testimony as insufficient to find clear error in the trial judge's order admitting defendant's confessions for two reasons.

First, in determining whether the trial judge erred in finding the confessions voluntary, this court should not consider information presented only at trial and then undertake what amounts to a *de novo* review. Rather, this court must review the trial judge's ruling based on the evidence presented at the voluntariness hearing. *See West Virginia v. Farley*, 192 W.Va. 247, 452 S.E.2d 50, 56–57 (1994).

West Virginia appears to be the only court that has addressed this issue expressly. In *Farley*, the defendant moved to suppress evidence of his confession. At the suppression hearing, the officers who secured the confession testified but the defendant did not. The defendant testified at trial but did not renew his motion to suppress and the trial court did not revisit its ruling. On appeal, the defendant attempted to use his trial testimony to establish that the trial court erred in finding his confession admissible. The West Virginia Supreme Court held that "[b]ecause the defendant did not renew his motion to suppress at trial, specifically after he testified, he is now foreclosed from using trial testimony to challenge the trial court's ruling." *Id.*, 452 S.E.2d at 57. The *Farley* decision recognizes that, in determining voluntariness, the trial court's decision often reflects the court's determination of the credibility of the witnesses. The trial court, not this court, is in the best position to make that determination. *See id.* We expect our trial judges to evaluate carefully the demeanor and credibility of witnesses; we do not expect them to predict what, if any, additional testimony either party will present at trial.

This defendant's situation is analogous to that of the defendant in *Farley*. This court, therefore, should consider the trial judge's ruling on the motion to suppress based on the evidence presented at the suppression hearing. *See id.* When we limit our review to the evidence presented at the voluntariness hearing, the record contains nothing to suggest reliance.

I do not think it sufficient to say, as does the majority, that "even in the absence of an explicit statement by the Defendant at the hearing on the motion to suppress that he confessed because the detectives persisted in questioning him and threatened him, that conclusion is *inescapable on this record.*" *Supra* at 582, 911 P.2d at 588 (emphasis added). The conclusion is anything but "inescapable." To the contrary, I find nothing in the record that suggests that the trial judge clearly and manifestly erred in finding that defendant did not succumb to improper police coercion.

In addition, defendant's self-serving trial testimony does not create a fundamental error. Whether defendant relied on the alleged promises and threats depends upon which witness the trier of fact believed. The trial judge instructed the jury that it could consider defendant's statements to law enforcement personnel only if he made the statements voluntarily. In this case, as in all others, the jury was "the ultimate arbiter of voluntariness, and [was] free, in effect, [to] disagree with the judge, and reject the confession." *State v. Gretzler*, 126 Ariz. 60, 84, 612 P.2d 1023, 1047 (1980) (quotations omit-

ted). Through his trial testimony, defendant needed to convince the jury, not this court, that his confessions were involuntary. We assume the jury followed the law as given by the trial judge. The jury, therefore, either found the statements voluntary or convicted defendant on the basis of other evidence. This court should not substitute its opinion for that of the jury.

For the foregoing reasons, I would conclude that the record provides no basis for vacating the trial judge's order admitting defendant's confessions because the record of the voluntariness hearing provides no support for finding that defendant relied upon the alleged threats.

### D.

I also reject defendant's allegation that his confessions were involuntary because the officers lied about the evidence. The majority treats the officers' actions as a "part of the mix" for determining whether the confessions were involuntary. Regardless of the "mix" of facts, the basic question remains whether the police conduct overcame defendant's will. The record here did not require the trial judge to make such a finding.

Law enforcement inherently encourages police to use some trickery in their work, which courts tolerate if "the games do not overcome a suspect's will and induce a confession not truly voluntary." *Carrillo,* 156 Ariz. at 136, 750 P.2d at 894. When police lie to induce a confession, the confession is involuntary only if the evidence shows "that the defendant's will was overborne or that the confession was false or unreliable." *Tapia,* 159 Ariz. at 289, 767 P.2d at 10.

In particular, unless a defendant's will is overborne, a confession is not involuntary if a police officer lies to the defendant about a fingerprint match and a witness identification. *See Ledbetter v. Edwards,* 35 F.3d 1062, 1067–69 (6th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). The police officer in *Ledbetter,* Detective McMillan, showed the defendant

> two enlarged photographs of a latent fingerprint that the officer claimed had been recovered from the victim's van, and a

fingerprint that had allegedly been obtained from Ledbetter, together with a chart indicating that a fingerprint expert had made a "14 point comparison" between the latent and the identified fingerprints. In fact, the fingerprints were not Ledbetter's and no expert had made any such comparison . . . .

Detective McMillan also falsely told Ledbetter that the female victim and two other witnesses had identified him from a photographic array. In fact, no witness had identified him . . . .

Finally, McMillan told Ledbetter that the victim was waiting outside the interview room, prepared to identify her assailant. In fact, [the victim] was not at the police station. Instead, McMillan set up a female dispatcher to stand in front of a two-way mirror that could be seen from the interview room. The office lights were turned on and the blinds on the mirror were opened so that Ledbetter would see, from his vantage point inside the interview room, a woman's silhouette appearing at the window. McMillan left the interview room and returned approximately fifteen minutes later. He told Ledbetter that the victim had observed him through a mirror, that she had made a positive identification, and that she was sure that Ledbetter was the person who abducted her. At that point, Ledbetter "broke down in tears and started crying, said he was sorry for the way it happened, the way it had taken place, that he wanted to come clean and he wanted to make a new start for himself."

*Id.* at 1066.

Here, the police trickery did not rise to the level of the police trickery in *Ledbetter.* Further, unlike the defendant in *Ledbetter,* this defendant did not break down after the police lies. Rather, defendant continued to maintain his innocence until a second interview after a court appearance and a three-hour cooling off period. Further, the evidence does not show that the confessions were false or otherwise unreliable. To the contrary, the evidence ultimately placed defendant at the scene because his fingerprints were on the vehicle and an eyewitness did identify him.

I would not find clear or manifest error in the trial judge's conclusion that defendant voluntarily confessed despite the officers' untrue statements about the fingerprints and the eyewitness identification.

### E.

The majority also finds defendant's confessions involuntary because the police failed to honor defendant's invocation of his right to remain silent. The majority's characterization of the record as showing a "flagrant refusal of the officers to honor the repeated requests to remain silent" relies upon a considerable overstatement of the record.[9] As noted above, defendant made no confessions during the afternoon session after his comments allegedly invoking his right to be silent.

Assuming that defendant adequately invoked this right,[10] the facts of record certainly permitted the trial judge to find that defendant later withdrew his assertion. The evening interview, during which defendant admitted the armed robberies, began at defendant's request. Detective Schoch again informed defendant of his right to an attorney and to remain silent, and defendant indicated he wished to speak with the officers. Unlike the detectives in *Emery*, the officers here did not conduct the functional equivalent of interrogation after the break; no pressure had been brought to bear on defendant during the break and the officers did nothing to encourage him to initiate the second interview. *See Emery*, 131 Ariz. at 502–

03, 642 P.2d at 847–48. For those reasons, I disagree with the majority's conclusion that defendant's confessions were rendered involuntary by the officers' failure to honor his invocation of the right to remain silent.

For the foregoing reasons, I believe that the record provides no basis for vacating the trial judge's order admitting defendant's confessions because the record of the voluntariness hearing provides no support for finding that defendant relied on the alleged promises and threats.

### III.

The majority next finds that the trial judge erred in refusing to give a "mere presence" jury instruction. I again must disagree.

This court will not reverse a conviction based on a trial court's ruling on a jury instruction unless this court can reasonably suppose that the instructions, when taken as a whole, would mislead the jurors. *See State v. Schrock*, 149 Ariz. 433, 440, 719 P.2d 1049, 1056 (1986); *See State v. Shields*, 26 Ariz. App. 121, 123, 546 P.2d 846, 848 (1976). The trial court does not err in refusing to give instructions that are not correct statements of the law, do not fit the facts of the particular case, or are covered adequately by other instructions. *State v. Lambright*, 138 Ariz. 63, 74, 673 P.2d 1, 12 (1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984), *overruled on other grounds by Hedlund v. Sheldon*, 173 Ariz. 143, 840 P.2d 1008 (1992). Further, failure to give a particular

---

**9.** The Arizona Supreme Court has established that the police must terminate an interrogation when the defendant unequivocally invokes *Miranda* rights. The police may continue the interrogation if the defendant's invocation of *Miranda* is merely equivocal. *State v. Eastlack*, 180 Ariz. 243, 250, 883 P.2d 999, 1006 (1994) (analyzing *Davis v. U.S.*, — U.S. —, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). Here, none of defendant's statements constitutes an unequivocal invocation of his right to remain silent. In my view, defendant made only one statement that, at best, qualifies as an equivocal invocation. The majority makes much of defendant's assertions that "that's all I know man" and "I don't want to hear nothing else man." I am not persuaded that these statements are even equivocal, much less unequivocal, invocations of the right to remain silent. Defendant's statement, "Well get me outta here man. I'm going back to fucking

jail. That's all ..." appears to be more reflective of defendant's evaluation of his own situation than an invocation of a right to remain silent. Defendant's statement that "I'm not going to talk worth a shit anyway so it doesn't matter to me" is at most puzzling and does not come close to invoking a constitutional right to remain silent.

**10.** Factually, this case lies between the lines drawn in *State v. Bravo*, 158 Ariz. 364, 762 P.2d 1318 (1988), *cert. denied*, 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989) and *State v. Zimmerman*, 166 Ariz. 325, 802 P.2d 1024 (App. 1990). Whether defendant's invocation of the right to remain silent was equivocal presents a close question. Because the question is close, I would find no clear and manifest error in the decision of the trial judge, who heard the tape recording of the statement in question.

jury instruction is not fatal if the instructions, when read as a whole, adequately set forth the law. *State v. Poland,* 144 Ariz. 388, 403, 698 P.2d 183, 198, *cert. granted,* 474 U.S. 816, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985), *aff'd,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

In *Shields,* the defendant appealed the trial court's refusal to give a "mere presence" instruction. 26 Ariz.App. at 123, 546 P.2d at 848. When police responded to a silent alarm from a clothing store, they apprehended the defendant as he was running away from the store. On appeal, *Shields* found no reversible error. "The [trial] court instructed the jury on the prosecution's burden of proof, the defendant's presumption of innocence and on all the elements necessary to find the defendant guilty of the crimes charged. Either as a principle or as an accessory." *Id. Shields* went on to note that "mere presence" really was a matter for defense counsel to cover in argument, not for the trial court to cover in jury instructions. *Id.*

Here, defendant testified that he merely was a passenger in the Chevrolet Blazer and that a friend, Dee, was the person who drove the vehicle and who robbed the Whataburger on June 20, 1991. The trial judge denied defendant's request for the "mere presence" instruction because defendant was not charged with accomplice liability, and the state did not present evidence of accomplice liability. The only issue for the jury was one of identity. The jury believed that either defendant or someone else committed the crimes. The trial judge, therefore, found that the "mere presence" instruction was unnecessary.

The trial judge recognized that defendant could argue "mere presence" as a defense, but that absent a charge of accomplice liability, it did not need to instruct the jury on "mere presence." Because the instructions, when read as a whole, were a correct statement of the law, adequately set forth the law, and fit the facts of defendant's case, I believe that the trial judge did not err in refusing to give a "mere presence" instruction.

IV.

I concur with the majority's holding that the photographic lineup was not unduly suggestive.

V.

Because I find no instance of reversible error and after reviewing the entire record, no fundamental error, I would affirm defendant's convictions and sentences.