Timothy BEAVERS, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–8399.

Supreme Court of Alaska.

March 10, 2000.

Margi A. Mock, Quinlan Steiner, Assistant Public Defenders, Barbara K. Brink, Public Defender, Anchorage, for Petitioner.

John A. Scukanec, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

The superior court dismissed Timothy Beavers's robbery indictment on the ground that his confession was involuntary. The court of appeals reinstated the indictment, finding the confession voluntary under the "totality of the circumstances." Beavers argues that his confession was presumptively involuntary because it was partially induced by a police officer's threat of harsher treatment. Because we agree with Beavers, we reverse the court of appeals decision and vacate Beavers's indictment.

### II. FACTS AND PROCEEDINGS

#### A. Facts

The facts of this case are uncontested. On November 1, 1995, Alaska State Troopers Gerald Graham and David Tullis questioned Beavers, then sixteen years old, during their investigation of two Anchorage robberies. At approximately 2:00 p.m. the troopers arrived at the restaurant where Beavers worked. They identified themselves and informed Beavers of their desire to question him outside the restaurant in order to avoid the noise inside. At Graham's invitation, Beavers entered the troopers' vehicle and sat in the passenger's seat; Graham and Tullis occupied the driver's and rear seats, respectively. The interview that followed lasted twenty-one minutes.

Graham asked Beavers his age, and Beavers responded that he was sixteen. The troopers then informed Beavers that he was not under arrest, had not been charged with any crime, and remained free to terminate the interview and exit the vehicle at any time. However, Graham emphasized to Beavers the importance of Beavers's cooperation: "But, I do need to talk to you, it's real important. I think you know what it's about. And, I think you need to talk with me about it. Okay?"

Graham explained that he had recently interviewed several of Beavers's friends who were also implicated in the robberies under investigation and that the troopers now desired to obtain Beavers's "side of the story." The discussion shifted toward various burglaries committed by one of Beavers's friends. Beavers answered a few questions indicating his knowledge of his friend's involvement in the crimes. Graham then reiterated his earlier admonition concerning the importance of Beavers's cooperation in the interview:

And I want to make sure that uhm, I mean, if you're involved in the burglaries, you need to tell me. If you're not, that's fine, but if I later come back and find out that you are involved there's going to be some problems here, you understand? Okay. I want to get this cleared up now.

He also repeated his previous assurance that Beavers was not under arrest and could leave at will. Graham then directly questioned Beavers about his involvement in the burglaries. Beavers denied any participation.

Following Beavers's initial denial, Graham asked him several questions concerning his friends and the location of various stolen items. After Beavers had answered the questions to the troopers' satisfaction, Graham spoke the words that form the basis of Beavers's present appeal:

Okay. Well I know you're telling the truth because it's the same stuff we've already been told. I, but I have to confirm it. I mean, there's stuff I know and stuff I don't know. That's how I we do an interview. And, if you're telling me the truth, you'll be telling me stuff that I already know and I'll know that you're telling me the truth.

This is important, okay? It, it's very important. I know that when you're young, you do some stupid stuff, make a, make a wrong turn somewhere, okay. And, and you do some crazy stuff, okay? *But, if you're, if you try and hide it from me you're really going to get hammered.* I mean it's, you gotta come out and tell me the truth on this stuff, okay? I know some stuff that you're into and we're going to have to talk about that, okay?

(Emphasis added.)

Beavers responded affirmatively. Graham then asked Beavers if he understood. Beavers replied "[n]ot really. Like what kind of stuff?" Graham indicated his desire to discuss one of the robberies under investigation and showed Beavers a lineup containing photographs of Beavers and one of the other youths implicated in the robbery. Graham asked Beavers to identify himself and the other youth in the photograph, and Beavers complied.

Graham then asked Beavers if he understood what the lineup photographs were used for. Beavers gave a brief, inaudible answer, after which Graham responded:

That's right. You walk up to a victim and you say, "See anybody in here you recognize?" and they go (smack) "I recognize this person, this person was there. This person was one of the guys that robbed me." Now if you want to lie to me and get in more trouble, that's fine, okay? That's your decision. This is the only chance I can help you. You're young, you need to get this cleaned up now, okay? You want to tell me the truth?

Beavers immediately admitted his participation in the robbery. Responding to Graham's request that he describe the incident "in [his] own words," Beavers provided a detailed account of the robbery and explained how the youths had disposed of the stolen property. When Graham subsequently inquired about the other robbery under investigation, Beavers likewise admitted his involvement and described that incident for the troopers.

Graham acknowledged Beavers's forthrightness during the interview. He asked

Beavers to submit a palm print and to assist the troopers in retrieving the stolen property. Graham repeatedly informed Beavers that his cooperation in these matters was voluntary, providing Beavers with the opportunity to refuse. Beavers indicated his willingness to assist the troopers in retrieving the stolen property, but expressed reluctance at submitting a palm print. Graham responded by suggesting that the officers would obtain a search warrant if Beavers refused, and also informed Beavers that he might ultimately be arrested notwithstanding his cooperation. Beavers eventually acquiesced, was taken to the troopers' station for a palm print to be taken, and was later returned to his mother's residence by the troopers.

### B. *Proceedings*

In presenting its case to the grand jury, the prosecution relied in part upon Beavers's confession to Trooper Graham. The grand jury returned an indictment for first-degree robbery against Beavers.

Beavers moved to suppress his confession in superior court, alleging that it had been involuntarily given and obtained in violation of his *Miranda* rights.[1] The state opposed Beavers's motion. After an evidentiary hearing, the superior court ruled that the troopers had not violated Beavers's *Miranda* rights because Beavers was not in custody during the interview.

However, the superior court also found that Beavers's confession had been involuntary. The court noted the "politely confrontational" tone of Graham's interrogating tactics; that Beavers was only sixteen at the time of the interview; that the interview had occurred in the troopers' vehicle; that the troopers had subjected Beavers to "coercive suggestion" by identifying themselves as law enforcement officers; that Graham had represented to Beavers his alleged knowledge of numerous details surrounding the crimes; and that Graham had dominated the conver-

sation through his constant questions. The court also emphasized Graham's statements that Beavers would be "hammered" if he tried to conceal the truth from the troopers, that Beavers "need[ed] to get this cleaned up," and that he should tell the troopers the truth about the robberies.

Based upon Graham's statements to Beavers and the circumstances surrounding the interview, the superior court found that Graham had excessively pressured Beavers and essentially indicated to him that he lacked any choice but to confess. As a result, the court concluded that Beavers's will had been overcome and that his confession was coerced. The court thus granted Beavers's motion to suppress the confession and dismissed the indictment against him.

The state appealed the superior court's disposition of the voluntariness issue to the court of appeals,[2] which reversed the lower court's determination. After reviewing the circumstances surrounding Beavers's confession, the court of appeals concluded that his age, the troopers' tactics, and the tone of the interview were insufficient to overcome Beavers's will.

The court of appeals also held that Graham's statement to Beavers that he would be "hammered" if he lied did not render Beavers's confession involuntary. Analogizing the trooper's threat to a promise of more favorable treatment, the court of appeals analyzed Beavers's confession under the "totality of circumstances" approach and determined that his statement was voluntary notwithstanding the threat. The court of appeals thus reversed the superior court's order and reinstated Beavers's indictment.

Beavers seeks reversal of both the reinstatement of his indictment and the determination that his confession was voluntary. We granted Beavers's petition, directing the parties to address, inter alia, the issue of whether an officer's threat of harsher treatment should be analyzed in the same manner as a

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Beavers cross-appealed the superior court's determination that he was not in custody for *Mi-*

*randa* purposes. The court of appeals affirmed the superior court's custody ruling, and Beavers does not raise the issue in his petition to this court.

promise of leniency when evaluating the voluntariness of a suspect's confession.

## III. STANDARD OF REVIEW

 We review the trial court's determination concerning the voluntariness of Beavers's confession as a mixed question of law and fact.[3] Our review reflects the three-part nature of the lower court's inquiry: "First, the trial judge must find the external, phenomenological facts surrounding the confession. Second, from these external facts, the judge must infer an internal, psychological fact: the mental state of the accused. Finally, the judge must assess the legal significance of this inferred mental state."[4]

 The first step of this process involves the trial judge's role in fact-finding and weighing the credibility of witnesses; we review the judge's findings of historical fact deferentially, and will overturn them only if clearly erroneous.[5] In determining the accused's mental state and its legal significance, however, we conduct an independent examination of the entire record and base our conclusion upon the totality of circumstances surrounding the confession.[6]

## IV. DISCUSSION

### A. Alaska Law Regarding the Voluntariness of Confessions

 Legal principles derived from our previous decisions provide the framework for addressing the issues in the present case. "A confession is not admissible into evidence unless it is voluntary. In determining whether a confession is the product

of a free will or was the product of a mind overborne by coercion the totality of circumstances surrounding the confession must be considered."[7] Among the circumstances relevant to the court's determination of voluntariness are "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[8]

 The prosecution must prove the voluntariness of the confession by a preponderance of the evidence.[9] When the accused is a juvenile, the state assumes a particularly heavy burden of proof.[10] We have also recognized "[t]he manner of interrogation, including whether any threats or promises induced the confession, ... [as] an important factor to be considered."[11] We have repeatedly quoted the test enunciated in *Bram v. United States*[12] as a baseline for voluntariness analysis:

[A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.[13]

 Significantly, however, *Bram*'s seemingly absolute prohibition on all promises is not dispositive:[14]

That language has never has never been applied with ... wooden literalness.... The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circum-

---

3. See *State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987).

4. *Id.* (citation omitted).

5. See *id.*

6. See *id.*

7. *Sovalik v. State*, 612 P.2d 1003, 1006 (Alaska 1980) (quoting *Ladd v. State*, 568 P.2d 960, 967 (Alaska 1977)).

8. *Sprague v. State*, 590 P.2d 410, 414 (Alaska 1979) (citation omitted).

9. See *id.* at 413.

10. See *S.B. v. State*, 614 P.2d 786, 789 (Alaska 1980) (citing *Quick v. State*, 599 P.2d 712, 720 (Alaska 1979)).

11. *Id.* (citing *Sprague*, 590 P.2d at 414).

12. 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

13. *Webb v. State*, 756 P.2d 293, 296 (Alaska 1988); *Stobaugh v. State*, 614 P.2d 767, 771 (Alaska 1980); *Sovalik*, 612 P.2d at 1006; *S.B.*, 614 P.2d at 789; *Sprague*, 590 P.2d at 413 n. 6.

14. See *Stobaugh*, 614 P.2d at 771.

stances discloses that the conduct of law enforcement was such as to overbear (the defendant's) will to resist and bring about confessions not freely self determined.[15]

We have noted that the facts of *Bram* do not require a blanket rule against promise-induced confessions; that subsequent Supreme Court decisions demonstrate the importance of case-specific factual nuances in determining voluntariness; and that a per se approach might result in the loss of reliable and probative confessions.[16]

We have thus expressly "reject[ed] a per se rule which would condemn any incriminatory statement obtained by means of a promissory inducement," and have instead adopted a "totality of circumstances" approach in examining the voluntariness of an accused's confession.[17] We have employed this multi-factor analysis even when police have engaged in improper conduct to induce confessions, and we have affirmed the voluntariness of inculpatory statements induced by police trickery and misrepresentation of evidence.[18]

■ But in *Webb v. State*[19] we recognized that "certain improper conduct is so coercive as to render a *Miranda* waiver involuntary without regard to the totality of circumstances."[20] The police officer in *Webb* had conditioned the return of a suspect's driver's license to him upon his agreement to provide a statement.[21] We concluded that the officer's conduct was sufficiently coercive to render the suspect's confession involuntary notwithstanding the other factors surrounding the interrogation.[22]

■ We noted that the suspect in *Webb* was "presented with the illusory choice of exercising his right to remain silent and losing a valuable property interest, his driver's licence, and making an incriminating statement to secure [its] return."[23] Condemning this Hobson's choice, we held that *Miranda* waivers "obtained by conditioning the exercise of the constitutional guarantee against self-incrimination against the loss of another constitutionally protected interest" were per se involuntary.[24]

**B. *Police Threats Are Presumptively Coercive.***

Although we have repeatedly stated that a police officer's promissory inducement represents only one factor in the "totality of circumstances" approach, we have never expressly evaluated a police officer's threat of harsher treatment under the same analysis. The issue of whether courts should analyze promises and threats identically constitutes the central issue in the present appeal, and it is one of first impression for this court.

Beavers asks us to hold police threats per se coercive, obviating judicial examination of the other factual circumstances surrounding an accused's confession. The state argues that a threat should, like an officer's promise of leniency, represent merely one of several factors for consideration under this court's "totality of circumstances" approach.

■ A criminal suspect's right to remain silent in the face of police interrogation represents one of the most fundamental aspects of our constitutional jurisprudence.[25]

---

**15.** *Id.* at 771–72 (quoting *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.1967), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967)).

**16.** *See id.* at 772 (citing *United States v. Williams*, 447 F.Supp. 631, 636–37 (D.Del.1978)).

**17.** *Id.* As noted *infra*, however, we have recognized that some police conduct is so coercive as to automatically render a confession involuntary notwithstanding other factors surrounding the accused's interrogation.

**18.** *See Sovalik*, 612 P.2d at 1007 & n. 4 (confession induced in part by police misrepresentation of inculpatory evidence; trickery in obtaining confession merely one factor in analysis of voluntariness).

**19.** 756 P.2d 293 (Alaska 1988).

**20.** *Id.* at 297.

**21.** *See id.*

**22.** *See id.*

**23.** *Id.*

**24.** *Id.*

**25.** The right is guaranteed by the Fifth Amendment to the Constitution of the United States and article I, section 9 of the Alaska Constitution. *See Miranda*, 384 U.S. at 467, 86 S.Ct. 1602 ("[T]here can be no doubt that the Fifth Amend-

It includes the right to terminate an interrogation at any time.[26] We regard any potential encroachment upon this right with the utmost concern. A law enforcement officer's threat of harsher than normal treatment—however phrased—essentially conveys to criminal suspects that they will be punished for their silence, including any refusal to give further answers.[27] Threats of harsher treatment for refusing to confess present suspects with the same type of choice which we found to be unacceptable in *Webb*.[28] Suspects are told, in effect, that they must give up their constitutional right to silence or they will suffer greater punishment. We view such threats with disfavor.[29] Where they are used, the resulting confession should be considered involuntary unless the state can show affirmatively that the confession was voluntarily made.[30]

In reaching our conclusion, we draw guidance from the Ninth Circuit's decision in *United States v. Harrison*.[31] Harrison was suspected by federal authorities of money laundering. Without warning, fifteen federal agents entered Harrison's house with weapons drawn, arrested Harrison and her companion, and searched her home.[32] The agents advised Harrison of her *Miranda* rights, after which an agent informed her of evidence linking her to the crime under investigation.[33] The agent then told Harrison that she could potentially receive a twenty-year sentence for her participation in the crime, and asked whether she thought it would be better if the judge was told of her cooperation or noncooperation.[34] Harrison responded that it would be better if the judge was informed of her cooperation, and she proceeded to confess her criminal involvement to the agents.[35] The district court found Harrison's confession voluntary and ultimately convicted her of money laundering.[36]

The Ninth Circuit reversed Harrison's conviction, holding her confession involuntary.[37] While expressing its continued adherence to the "totality of circumstances" approach, the court nevertheless established

ment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves."); *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("[T]he American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay.").

**26.** *See Miranda,* 384 U.S. at 445, 86 S.Ct. 1602 (stating that "[t]he mere fact that [the defendant] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries").

**27.** *See Malloy,* 378 U.S. at 7, 84 S.Ct. 1489 ("[T]he Fifth Amendment guarantees . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence."); *United States v. Harrison,* 34 F.3d 886, 891 (9th Cir.1994) ("Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations."); *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 n. 2 (9th Cir.1988) ("Threatening to inform the prosecutor of a suspect's refusal to cooperate violates her fifth amendment right to remain silent.").

**28.** 756 P.2d at 297 (holding that state trooper's conduct in retaining defendant's driver's license and conditioning its return on his giving statement was coercive and made defendant's *Miranda* waiver involuntary).

**29.** *See Miranda,* 384 U.S. at 468 n. 37, 86 S.Ct. 1602 ("it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation").

**30.** Because this represents a step toward a literal interpretation of *Bram*'s injunction against the use of threats and away from complete reliance on a totality of circumstances approach, and may therefore be more demanding than federal constitutional law, we base this ruling on article I, section 9 of the Alaska Constitution.

**31.** 34 F.3d 886 (9th Cir.1994).

**32.** *See id.* at 890.

**33.** *See id.*

**34.** *See id.*

**35.** *See id.*

**36.** *See id.*

**37.** *See id.* at 892–93.

an exception for confessions induced by police threats to inform the prosecutor of a suspect's refusal to cooperate. According to the court, "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." [38]

The *Harrison* court reiterated the permissibility of confessions secured by an officer's promise of leniency.[39] The court also acknowledged the arguable equivalence between such promises and police threats to inform the prosecutor of a suspect's refusal to cooperate, noting that "[i]n many ways, both types of statements are simply different sides of the same coin: 'waive your rights and receive more favorable treatment' versus 'exercise your rights and receive less favorable treatment.' " [40] The Ninth Circuit determined, however, that

> [t]he two types of statements are not entirely interchangeable. Defendants may get some benefit from learning about the possibility of reduced sentences, though that benefit would hardly vanish if the government communicated the prospect of leniency through defendants' attorneys rather than at the time of arrest. We also have observed that in most circumstances, speculation that cooperation will benefit the defendant or even promises to recommend leniency are not sufficiently compelling to overbear a defendant's will.[41]

In distinguishing promises to communicate a suspect's cooperation to the prosecutor from threats to inform the prosecutor of the suspect's lack of cooperation, the *Harrison* court reasoned:

> Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a

defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.[42]

The Ninth Circuit thus rejected the government's request to examine Harrison's inculpatory statement in context of all the circumstances involved in the case and held the agent's suggestion that he might inform the judge of Harrison's failure to cooperate inherently coercive.[43]

We find *Harrison*'s reasoning persuasive and agree with the Ninth Circuit's distinction between promises of leniency and threats of harsher treatment. We also note that at least two other cases have taken a similar approach.

In *United States v. Tingle,* a credit union employee (Tingle) was under suspicion of stealing funds.[44] After claiming that she had been attacked by an unknown assailant who had tied her up and stolen money from the safe of the credit union, Tingle was escorted by two FBI agents to their vehicle for further questioning.[45] During the hour-long interview, Tingle initially repeated the alibi she had given earlier.[46] The agents accused her of lying and explained to her the advantages of truthfully cooperating with the investigation.[47] They enumerated the crimes—and corresponding prison terms—for which she might be found guilty.[48] Tingle continued to deny the accusations.[49]

The agents explained to Tingle that it was in her best interest to cooperate, and told her that, depending on her decision, they would inform the prosecutor either of her coopera-

**38.** *Id.* at 891–92.

**39.** *See id.* at 891.

**40.** *Id.*

**41.** *Id.* at 891 (citation omitted).

**42.** *Id.* (quoting *United States v. Tingle,* 658 F.2d 1332, 1336 n. 5 (9th Cir.1981)).

**43.** *See id.* at 891–92.

**44.** 658 F.2d 1332, 1333 (9th Cir.1981).

**45.** *See id.*

**46.** *See id.*

**47.** *See id.* 1333–34.

**48.** *See id.*

**49.** *See id.* at 1334.

tion with the investigation or her refusal to do so.[50] They also indicated that she might lose contact with her young child if she was ultimately jailed.[51] Tingle began to sob and visibly shake during the interview.[52] She eventually confessed to the crime and was convicted.[53] The Ninth Circuit reversed the conviction, holding that the agent's threats had invalidated her confession.[54]

In *State v. Strayhand*, a theft and robbery suspect was arrested and interrogated at the police station.[55] The interviewing detectives repeatedly threatened Strayhand with enhanced punishment for failure to cooperate with the investigation, warning him that they would ask for "a lot of jail time," would "hang him in court," and would "have it made" after informing the judge of his refusal to confess.[56] During a subsequent interview later that day, Strayhand admitted his guilt and was eventually convicted at trial.[57] The Arizona Court of Appeals reversed Strayhand's conviction, holding his confession involuntary due to the detectives' threats of harsher treatment.[58]

## V. CONCLUSION

Threat-induced confessions should be considered presumptively involuntary absent evidence affirmatively indicating that the suspect's will was not overcome by the threats. We have reviewed the record in the present case and agree substantially with the trial court's view of the evidence. Trooper Gra-

ham's threat to Beavers that he would be "hammered" if he attempted to hide his conduct from Graham and that "we're going to have to talk about that" conveyed an unmistakable message that Beavers would be punished for exercising his constitutional right to silence. There are no affirmative indications that the trooper's threats of harsher treatment were ineffective. We therefore hold that the court of appeals' decision must be REVERSED and the superior court's ruling reinstated.

BRYNER, Justice, with whom EASTAUGH, Justice, joins, dissenting.

I dissent from this opinion because it muddles the law of confessions and suppresses a statement that, by our traditional test, is voluntary.

Today's opinion announces that "threat-induced" confessions must now be considered "presumptively involuntary absent evidence affirmatively indicating that the suspect's will was not overcome by the threats." [1] The court takes this rule from article I, section 9, of the Alaska Constitution with scarcely a glance to see whether it finds support in the text, context, or history of this constitutional provision.[2]

In fact this new rule finds little support in our constitution or jurisprudence. We have consistently viewed the Alaska Constitution

---

50. *See id.*

51. *See id.* & n. 2.

52. *See id.* at 1334.

53. *See id.*

54. *See id.* at 1336–37.

55. 184 Ariz. 571, 911 P.2d 577, 581–82 (App. 1995).

56. *Id.* at 582–85.

57. *See id.* at 581, 584.

58. *See id.* at 585–88, 594.

1. Op. at 1048.

2. Although "we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution," we generally do so only "if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage." *Baker v. City of Fairbanks*, 471 P.2d 386, 402 (Alaska 1970). *Cf. State v. Zerkel*, 900 P.2d 744, 758 n. 8 (Alaska App.1995) (citing *Abood v. League of Women Voters*, 743 P.2d 333, 340–43 (Alaska 1987); *State v. Wassillie*, 606 P.2d 1279, 1281–82 (Alaska 1980); *Annas v. State*, 726 P.2d 552, 556 n. 3 (Alaska App.1986); *State v. Dankworth*, 672 P.2d 148, 151 (Alaska App.1983)) (observing that a provision of the Alaska Constitution will be interpreted to provide greater protection than a corresponding provision of the federal constitution only if there is "something in the text, context, or history of the Alaska Constitution that justifies this divergent interpretation").

as protecting against involuntary confessions to the same extent as the federal constitution.[3] Until now we have resisted adopting more stringent "per se" rules for confessions.[4]

In *Stobaugh v. State*, we expressly declined to hold that a confession induced by a promise should be deemed involuntary as a matter of law.[5] Refusing to read "wooden literalness" [6] into the United States Supreme Court's admonition in *Bram v. United States* that confessions not be "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight," [7] we found three reasons to reject a per se rule excluding confessions obtained by promissory inducements:

> First, the facts of *Bram* do not require such a per se rule. Second, subsequent cases demonstrate that factual nuances may be very important in determining voluntariness. Third, the probable loss of reliable and probative confessions that would result from rigid adherence to a per se rule militates in favor of examining all the circumstances surrounding a promise-induced confession.[8]

Thus, we opted to adhere to the traditional test of voluntariness, which simply determines from the totality of the circumstances whether the police overbore the defendant's free will.[9]

Though *Stobaugh* considered only confessions induced by promises, the three reasons it gives for rejecting a per se rule apply with equal force to confessions induced by threats. First, here, as in *Stobaugh*, "the facts of *Bram* do not require such a per se rule." [10] The court's decision today pinpoints a valid distinction between threats and promises—a distinction missed by the court of appeals: threats are generally more coercive than promises.[11] But this hardly requires a rule that would exempt all threats from the traditional voluntariness analysis and categorically declare threat-induced statements to be involuntary.

Second, with promises and threats alike, "factual nuances may be very important in determining voluntariness." [12] There are limitless forms of threats, and they can occur under an infinite variety of circumstances; often the difference between a threat and a promise is a matter of subtle interpretation.[13]

**3.** *See, e.g., State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987); *Stobaugh v. State*, 614 P.2d 767, 771–72 (Alaska 1980); *Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980); *Sprague v. State*, 590 P.2d 410, 413 and n. 6 (Alaska 1979); *cf. Quick v. State*, 599 P.2d 712, 719–20 (Alaska 1979); *Cole v. State*, 923 P.2d 820, 822–23 (Alaska App. 1996).

**4.** *See, e.g., Stobaugh*, 614 P.2d at 772 ("We therefore reject a per se rule which would condemn any incriminating statement obtained by means of a promissory inducement."); *Ridgely*, 732 P.2d at 556 (noting, in reversing a finding of involuntariness, that the mere fact of minority did not automatically preclude a voluntary waiver).

In this regard, the court's reliance on *Webb v. State*, 756 P.2d 293, 297 (Alaska 1988), is unpersuasive. *See* Op. at 1045. *Webb* did not involve the voluntariness of a confession; it dealt with the voluntariness of a *Miranda* waiver—an area of the law in which adherence to bright-line rules is the norm and deterrence to ensure police compliance with these bright lines is the primary goal. By contrast, in cases involving involuntary confessions, where the primary goal is to enforce "the strongly felt attitude of our society that important human values are sacrificed where . . . the government . . . wrings a confession out of an accused against his will," the norm has long

been a case-specific inquiry to determine actual voluntariness. *See Cole v. State*, 923 P.2d at 829–30 & n. 16 (quoting *Jackson v. Denno*, 378 U.S. 368, 386, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)).

**5.** 614 P.2d at 771–72.

**6.** *Stobaugh*, 614 P.2d at 771–72 (quoting *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.1967)).

**7.** *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

**8.** *Stobaugh*, 614 P.2d at 772 (citing *United States v. Williams*, 447 F.Supp. 631, 636–37 (D.Del. 1978)).

**9.** *Stobaugh*, 614 P.2d at 772.

**10.** *Id.*

**11.** Op. at 1046 – 1047.

**12.** *Stobaugh*, 614 P.2d at 772.

**13.** For example, in *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Supreme Court noted, "[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to

Many settings can be imagined in which a particular threat—just like a promise—would have no realistic tendency to overbear a particular person's will. And nothing in the generally more coercive nature of threats makes the coercive effect of a specific threat inherently more difficult to gauge on a case-by-case basis than the coercive effect of a promise.

Third, for both promises and threats, "the probable loss of reliable and probative confessions that would result from rigid adherence to a per se rule militates in favor of examining all the circumstances surrounding

a . . . confession." [14] The reasoning in *Stobaugh* thus refutes the per se rule that the court adopts in this case.

The court nevertheless cites three cases as favoring its decision to immunize threats from analysis under the traditional voluntariness test: [15] *United States v. Tingle,* [16] *United States v. Harrison,* [17] and *State v. Strayhand.* [18] But none of these cases supports the court's "woodenly literal" presumption. They all involve blatantly coercive custodial interrogation and are distinguishable on their facts. [19] Here, by contrast, we have a brief,

allow a suspect to call his wife until he confessed.". Should it make any difference, under the same circumstances, that the police rephrased the threat as a promise to allow the suspect to call if he confessed?

**14.** *Stobaugh,* 614 P.2d at 772.

**15.** Op. at 1046–1048.

**16.** 658 F.2d 1332 (9th Cir.1981).

**17.** 34 F.3d 886 (9th Cir.1994).

**18.** 184 Ariz. 571, 911 P.2d 577 (App.1995).

**19.** In each case, interrogation occurred in a particularly coercive setting; the accused either attempted to remain silent while under interrogation or adamantly denied guilt; and the police bluntly threatened harsher punishment unless the accused surrendered the right to silence. These factual distinctions deserve emphasis to demonstrate the extent to which the "threat" in this case differs from the kinds of threats that other courts have condemned.

The court in *Tingle* described the interrogation as follows:

The Federal Bureau of Investigation (FBI) was notified of the "robbery." FBI Special Agents Sibley and Ayers arrived at the credit union, spoke to the local police officer, and escorted Tingle to their automobile parked in front of the credit union in order to speak with her privately.

Tingle sat in the back seat of the automobile with Sibley while Ayers sat in the front seat. The interrogation which followed lasted for approximately one hour. Tingle repeated to the special agents what she had told the local officer. Sibley gave Tingle a standard. FBI Advice of Rights form and asked her to read it aloud. Tingle read the form, indicated that she understood her rights and was willing to answer questions, and signed the written waiver.

Sibley then accused Tingle of lying. He told her that he believed she and her boyfriend had staged the robbery. Tingle denied her involve-

ment. At that point, both agents were firmly convinced that Tingle had staged the "robbery" because of what they viewed as its amateurish commission. Sibley began to explain to Tingle the advantages of cooperating in an effort to get her to tell the truth. He enumerated the crimes of which she might be guilty. He told her that she faced a twenty year sentence for bank robbery, twenty-five years if it was armed robbery, five years for conspiracy, five years for lying to a federal agent, and an additional potential penalty of five years if Tingle were to lie to a grand jury. Tingle repeatedly maintained her innocence.

Sibley explained that it would be in Tingle's best interest to cooperate. There was some discussion about Tingle's release on her own recognizance during court proceedings. Sibley stated that he would inform the prosecutor if Tingle were to cooperate, or would alternatively inform the prosecutor that she was "stubborn or hard-headed" if she refused. Sibley suggested that it was quite possible that he had been told by Tingle's boyfriend that she was the one responsible for the entire planning and execution of the staged robbery.

At the beginning of the interrogation Sibley had determined that Tingle was the mother of a two-year-old child. In an effort to obtain a confession, Sibley told her either that she *would* not see the child for a while if she went to prison or that she *might* not see the child for a while if she went to prison. His purpose was to make it clear to her that she had "a lot at stake."

During Sibley's interrogation Tingle began to sob. She was noticeably shaking. She continued to cry for at least ten minutes.

*Tingle,* 658 F.2d at 1333–34 (footnotes omitted). In *Harrison,* the accused

heard noises outside her house. Upon opening her front door, she discovered approximately fifteen federal agents with their guns drawn. The agents searched the house and arrested Harrison and [her companion] Marshall.

. . . .

[T]he agents advised Harrison of her rights. She replied that she understood those rights.

non-custodial interrogation that would be unremarkable but for a single, passing mention of getting "hammered."

A second point of distinction between Beavers's case and the three cases relied on by the court is that none of these cases categorically condemns all potentially threatening comments uttered during an interrogation. Each case involved overt or thinly veiled threats of reprisal for the accused's exercise of the constitutional right to silence; this particular type of threat—the threat that a defendant may "be made to suffer for his silence"—is the only type these cases condemn as without "legitimate purpose." [20]

There can be no plausible claim of any such threat in this case. Beavers could not have understood the trooper's reference to getting "hammered" as a threat of reprisal for exercising his right to remain silent. When the comment occurred, Beavers had already abandoned his right to silence and was freely talking to the police about himself and his friends. He had been repeatedly told—and by all indications fully understood—that he was free to stop talking and leave at any time. In context, then, if the

> After a brief silence, an agent told Harrison that he had documents showing that she was involved in money laundering. He said that the government had seized packages of drugs that had been mailed to Marshall and could determine whether her fingerprints were on the packages. The agent informed her that she might be facing up to twenty years in prison. He asked her whether she thought it would be better if the judge were told that she had cooperated or had not cooperated. Harrison responded that it would be better if she talked to the agents and they told the judge that she had cooperated. She then gave a statement to the agents.
>
> *Harrison*, 34 F.3d at 890.
>
> And in *Strayhand*, the defendant, who had been arrested and jailed on suspicion of robbery, was removed from jail and subjected to a lengthy interrogation at the police station. Strayhand repeatedly refused to make a statement and asked to be taken back to jail, but the police continued the interrogation, repeatedly threatening to ask for an increased sentence if Strayhand refused to cooperate. The interrogation ultimately ended with the following statement to Strayhand: "I'm going to go ahead and file cases and *I get to go in and say you were uncooperative and didn't want to help me so I've got it made. Makes me real easy here. But it's never too late.*" Strayhand later confessed. *Strayhand*, 911 P.2d at 581–84.

trooper's remark about getting "hammered" threatened any reprisal, the only reprisal it threatened was for lying—it anticipated Beavers's willingness to keep talking and warned him in realistic terms of the consequences that he was likely to face if he actively misrepresented the facts: "[I]f you're telling me the truth, . . . I'll know that you're telling me the truth. This is important, okay? . . . But, if you're, if you try and hide it from me you're really going to get hammered."

The final, and perhaps most crucial, point distinguishing this case from *Tingle*, *Harrison*, and *Strayhand* is that none of those cases applies an artificial "presumption of involuntariness" like the constitutional presumption this court creates today. Although these cases all roundly condemn threats of reprisal for exercising the constitutional right to silence, they do not pretend that such threats automatically render confessions invalid; to the contrary, each case carefully and faithfully adheres to the traditional law of confessions, determining, from the totality of the circumstances, that the police actually overbore the defendant's free will.[21]

20. *Tingle*, 658 F.2d at 1336 n. 5. *See also Harrison*, 34 F.3d at 891 (quoting *Tingle*, 658 F.2d at 1336 n. 5); *Strayhand*, 911 P.2d at 586 ("A defendant should not be penalized for exercising his rights.").

21. The *Tingle* court noted:

> When we consider the totality of the circumstances, we conclude that the psychological coercion brought to bear upon Tingle produced her confession. We hold, therefore, that Tingle's confession was not "the product of a rational intellect and a free will" and was involuntary.

*Tingle*, 658 F.2d at 1337 (footnote omitted). Similarly, in *Harrison*:

> While none of the agents made explicit threats, subtle psychological coercion can effectively overbear a suspect's free will.
>
> . . . Harrison broke her silence only after the agent asked whether she thought it preferable if the judge were informed that she had cooperated or not cooperated. The first thing she said was that she thought it would be better if she talked to the agents and they informed the judge that she had cooperated.
>
> "[T]he Fifth Amendment guarantees . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for silence." The agent's question was improper.

If anything, these cases illustrate that we add nothing to the law when we conclude that "[t]hreat-induced confessions should be considered presumptively involuntary absent evidence affirmatively indicating that the suspect's will was not overcome by the threats." [22] As the court in *Strayhand* declared, existing law already presumes that every confession is involuntary: "All confessions are presumed to be involuntary, and the state bears the burden of proving by a preponderance of the evidence that any confession is voluntary and freely given." [23] This court's opinion acknowledges as much and further recognizes that under Alaska law "[w]hen the accused is a juvenile, the state assumes a particularly heavy burden of proof." [24]

Thus, at best, the court creates a superfluous layer of presumption that distracts attention from the critical question: did Beavers voluntarily confess? At worst, the court creates a new presumptive test of voluntariness that bypasses the traditional, totality of the circumstances determination.

The court's insistence on affirmative evidence of voluntariness is troubling and will surely confound judges, practitioners, and police officers. If the court means by "affirmative evidence" only that, because all threats are potentially coercive and this case involves a threat, the state has failed to meet its heavy burden of proving voluntariness by a preponderance under the totality of the circumstances, then the presumption serves no purpose. A straightforward application of the conventional totality of the circumstances test would yield the same conclusion.

But the court seems to mean something more since its decision reversing the court of appeals relies on the absence of "affirmative indications" of voluntariness and appears to stop short of independently reviewing the totality of the circumstances to determine whether the police actually "hammered" Beavers into an involuntary confession.

Yet there is no dispute here about the circumstances surrounding Beavers's confession, and the confession itself is entirely recorded. Short of an admission by Beavers that he confessed voluntarily, it is hard to conceive of any other "affirmative" evidence of voluntariness that the state might have presented. This situation is not unusual: the police currently record almost all interrogations. If a full recording of the confession does not suffice to dispel the presumption of involuntariness and require voluntariness to be determined under the totality of the circumstances, then the court's per se rule is something more than a conventional presumption: [25] it is essentially a blanket rule

---

The government cannot meet its burden of proving that Harrison decided of her own free will to give a statement.

*Harrison*, 34 F.3d at 892 (internal citations omitted). Finally, in *Strayhand*, the court found that it

must look to all of the circumstances surrounding a confession or confessions in determining whether the Defendant's will was overborne. Here, even in the absence of an explicit statement by the Defendant at the hearing on the motion to suppress that he confessed because the detectives persisted in questioning him and threatened him, that conclusion is inescapable on this record. The State had the burden of proof on this point, and it came forward with nothing to suggest anything but that the detectives' impermissible tactics bore fruit.

. . . .

Keeping in mind that the question of whether a confession is voluntary must be decided upon the totality of circumstances, we believe that the flagrant refusal of the officers to honor the Defendant's repeated requests to remain silent had a significant effect on procuring his confession. The detectives recited the litany of rights and then ran roughshod over them. This is coercive in itself. Further, had the officers honored the Defendant's request, the dialogue which led to and included the threats would never have taken place.

*Strayhand*, 911 P.2d at 588, 592.

22. Op. at 1048.

23. *Strayhand*, 911 P.2d at 585.

24. Op. at 1044.

25. Under Alaska Evidence Rule 303, a presumption directed against the state in a criminal case ordinarily is "treated in the same manner as a presumption in a civil case under Rule 301."

Under Evidence Rule 301 a presumption in a civil action normally "imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion."

suppressing all confessions in interrogations that involve an arguable threat.

This of course would be the functional equivalent of *Bram*'s now universally disavowed "woodenly literal" prohibition.[26] I doubt that the court actually has such a rule in mind. But if the court means to land somewhere between the conventional test and *Bram,* its intended target is uncertain; it fashions a rule that will be misinterpreted and misapplied. And the price of this uncertainty will be paid in the needless suppression of voluntary confessions.

In my view, the present case provides a good example. Two troopers subjected Beavers to a brief, matter-of-fact interrogation. Beavers was not in custody. Though only sixteen years old, he had a regular job and was contacted at his place of employment. When asked if he would mind accompanying the troopers to the station to "talk where it's a little quieter," Beavers had the assertiveness and presence of mind to respond, "I prefer if we, like, talked here." The troopers immediately honored his request. It seems apparent, then, that Beavers was capable of understanding that he had control over his own situation and had good reason to think that the troopers would not ignore his choices.

Once the interview began, Trooper Graham immediately reassured Beavers that he was not under arrest and was free to go at any time. Beavers understood. He freely discussed his knowledge of some recent burglaries, truthfully denying any involvement. In the course of this discussion, Trooper Graham reminded Beavers, "Like I told you, you're not under arrest, you're free to go. Ah you know, I'm not holding you here." Beavers continued to answer questions.

Trooper Graham soon shifted the discussion to a recent robbery, exhorting Beavers to tell him the truth; in the midst of this exhortation, the trooper uttered the "hammering" threat:

GERRY GRAHAM: Okay. Well I know you're telling the truth because it's the same stuff we've already been told. I, but I have to confirm it. I mean, there's stuff I know and stuff I don't know. That's how I we do an interview. And, if you're telling me the truth, you'll be telling me stuff that I already know and I'll know that you're telling me the truth. This is important, okay? It, it's very important. I know that when you're young, you do some stupid stuff, make a, make a wrong turn somewhere, okay. And, and you do some crazy stuff, okay? But, if you're, if you try and hide it from me you're really going to get hammered. I mean it's, you gotta come out and tell me the truth on this stuff, okay? I know some stuff that you're into and we're going to have to talk about that, okay?

Beavers hardly seemed cowed by the prospect of "hammering." In response to Trooper Graham's ensuing question, "I know some stuff that you're into and we're going to have to talk about that, okay?" Beavers answered, "Alright." The trooper followed up by asking, "Do you understand that?" Beavers responded, "Not really. Like what kind of stuff?" Trooper Graham answered that he was talking about the MAPCO robbery.

At that juncture, the trooper showed Beavers a photo lineup, asking him if he knew what it was. The lineup included photographs of Beavers and his friend, Danny. After making sure that Beavers recognized his own photograph and understood the significance of the lineup, Trooper Graham promised to help Beavers if he told the truth. Beavers immediately got the message and confessed:

GERRY GRAHAM: Do you know what these are?

TIM BEAVERS: Mug shots?

GG: Photo line ups, man. Who's that?

TB: Me.

GG: Who's that?

TB: Danny?

GG: Do you know what these are used for?

TB: (Inaudible)

---

**26.** *See, e.g., United States v. Thomas,* 595 A.2d 980, 981 (D.C.1991) (recognizing that the *Bram* test "under current precedent does not state the standard for determining the voluntariness of a confession").

GG: That's right. You walk up to a victim and you say, "See anybody in here you recognize?" and they go (smack) "I recognize this person, this person was there. This person was one of the guys that robbed me." Now if you want to lie to me and get in more trouble, that's fine, okay? That's your decision. This is the only chance I can help you. You're young, you need to get this cleaned up now, okay? You want to tell me the truth?

TB: I was there.

My review of the record, including the transcript and audio tape of Beavers's interrogation, persuades me that Trooper Graham's brief mention of "hammering" did nothing to induce Beavers's confession and failed even to come close to overbearing his will. It seems to me that Beavers understood his position and had full control of his situation until Trooper Graham displayed the photo lineup. Beavers incorrectly assumed that he had been identified in the lineup, and this triggered his confession. Beavers did not confess for fear of being hammered but for fear of having been nailed. His choice was one motivated by self-interest, not panic.

If anything in the interrogation overbore Beavers's free will, it was Trooper Graham's use of the photo lineup to create the false impression that Beavers had been identified, coupled with the trooper's simultaneous offer to help Beavers if he told the truth. Yet these tactics—ruses and promises of assistance—fall within the generally accepted range of proper interrogation.[27] And Beavers does not challenge this aspect of his interrogation.

Yet by relying on an artificial presumption of involuntariness, the court assigns conclusive significance to a mild and passively phrased threat that seemingly had no bearing on Beavers's free will. The court fails even to acknowledge as "affirmative indications that the trooper's threats ... were ineffective"[28] the permissible and potentially far more powerful psychological tactics that immediately preceded Beavers's confession. Because the court's newly adopted presumption obscures its inquiry into voluntariness and leads it to suppress a valid and reliable confession, I dissent from its decision reversing the court of appeals.

---

**27.** *See, e.g., Cole v. State,* 923 P.2d at 820, 831 (Alaska App.1996) ("[I]t is now well established that the Constitution does not altogether forbid the police from making promises or offering inducements to a suspect under interrogation."); *Sovalik v. State,* 612 P.2d 1003, 1007 n. 4 (Alaska 1980) ("[T]he use of trickery does not per se render a confession involuntary and most authorities hold that confessions produced by trickery are admissible so long as the device employed would have no tendency to produce an untruthful confession.").

**28.** Op. at 1048.