Cress CARNEY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10348.

Court of Appeals of Alaska.

March 4, 2011.

Dan S. Bair, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

W.H. Hawley, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

Cress Carney confessed to murder during an interview with the Dillingham police. He now argues that the investigating officers coerced his confession when they promised not to arrest him and promised not to tell others about what he admitted. He points out that we have suppressed confessions that were induced by similar promises of immunity. But despite the coercive potential of the officers' promises, the record demonstrates that Carney did not believe these promises and that Carney actually believed that he would be arrested and prosecuted for murder if he confessed. We accordingly conclude

that Carney's confession was not induced by the officers' promises.

### Background

Carney was charged with first-degree murder, second-degree murder, and tampering with evidence. He filed a motion to suppress the evidence obtained from his first police interview, arguing that his inculpatory statements during that interview were involuntary. Superior Court Judge Fred Torrisi held an evidentiary hearing on Carney's motion.

At the hearing, the parties stipulated to the admission of Carney's criminal record that included thirty-three prior convictions over a twenty-year period. Carney also presented the testimony of an Anchorage Police Department officer who spoke with Carney in February 2004 about an attempted sexual assault. The officer testified that Carney had requested a lawyer after receiving *Miranda* warnings, and the officer had terminated the interview.

The State presented the testimony of Sergeant John Kirby of the Dillingham Police Department. Kirby testified that Natalia Timurphy was reported missing on September 12, 2006. Her body was discovered on September 28 in the Nerka Pit area near Dillingham. Kirby and Sergeant Dan Pasquariello were assigned to the investigation in early November.

Kirby testified that on November 13, he and Pasquariello stopped at a convenience store called the Bristol Express for a break. Carney came up to Kirby and asked about the Timurphy investigation. Kirby replied that Carney was about the twenty-first person on their list of witnesses to interview, and that they were currently on the eighteenth interview. Carney said that he would be available when the police were ready to talk to him.

On November 15, Kirby contacted Carney at the home of Jackson McCormick. Kirby asked if Carney was available for an interview and suggested that the interview could be at Carney's home, McCormick's home, or the police station. Carney said that he would call Kirby after he picked up his girl-friend, but an hour later, Carney arrived at the police station without calling ahead.

At the suppression hearing, the State submitted a recording of Carney's interview with Kirby and Pasquariello. At the beginning of the interview, Kirby emphasized that he was not planning to arrest Carney or any of the other witnesses that they were interviewing. Over the course of the interview, the sergeants frequently repeated their promise that Carney would not be arrested.

Sometimes the promise was all-encompassing: "We're not going to arrest you, we're not going to arrest anybody else that we've talked to. I tell everybody the same thing: You're going to leave here just like you came here and go on about your life, okay?" Other times the promise was more limited in scope: "I can reiterate that we're not going to arrest you *today*" (emphasis added). In all, the sergeants repeated some form of this "you will not be arrested" promise at least a dozen times.

Kirby also promised that the police would not reveal the statements that they took from Carney and the other witnesses. He promised not to reveal Carney's statement to the victim's family or friends, to Carney's girlfriend, or to anyone else.

At first Carney denied knowing anything about Timurphy's death. But eventually he admitted that he had strangled Timurphy after she threatened to accuse him of raping her.

The interview lasted for about three hours. After Carney confessed, he went outside the station with Kirby to smoke cigarettes. Carney told Kirby that if he was arrested, he wanted Kirby to perform the arrest. Kirby clarified that Carney was not under arrest at that time, but Kirby agreed that he would be the one to arrest Carney "if it comes to that." When Kirby and Carney came back inside, Pasquariello explained that the police would be contacting the district attorney for direction. Carney then told Pasquariello that if he was arrested, he wanted Kirby to perform the arrest.

The officers obtained an arrest warrant the following day and arrested Carney at his home. Kirby told Carney that he was mak-

ing the arrest himself, as Carney had requested. Carney did not indicate any objection or surprise about his arrest. After the officers transported Carney to the police station, Kirby advised him of his *Miranda* rights. When Pasquariello indicated that they wanted to continue the interview, Carney said that he knew that they had recorded his interview from the day before. Carney waived his rights and repeated the confession he made the day before.

After this second interview, Carney and Kirby went outside the station again to smoke cigarettes. Carney asked about the district attorney's decision to press charges and indicated that he would like to talk with the district attorney. Carney also indicated that he couldn't sleep the night before because he was worried about the police coming to arrest him.

At the suppression hearing, Carney also presented the testimony and report of Dr. Richard Fuller, a neuropsychologist. Dr. Fuller reported that Carney had sustained a skull fracture and traumatic brain injury when he was nine years old and that he had a long history of substance abuse. Dr. Fuller reported that Carney had borderline intellectual functioning, with cognitive impairments in the areas of expressive language, abstract reasoning, and learning. He opined that Carney's understanding was more basic and concrete than the average person, but that he was generally capable of making reasonable decisions.

Judge Torrisi denied Carney's motion to suppress in a detailed fourteen-page decision. Based on Dr. Fuller's report and the interview transcript, the judge found that "Mr. Carney can follow the usual concrete-type conversation, he understands social norms, knows right from wrong, and comprehends cause and effect."

The judge found that the tone of the first interview was cordial, the two officers and Carney were the only ones present, and that

an audio recorder was in view during the questioning. He found that Carney was not mistreated in any way; the only question was whether his will was overborne by the officers' promises that he would not be arrested and their suggestions that the offender should be forgiven. The judge concluded that Carney's will was not overborne: he wanted to talk with the officers and did not actually believe that he would never be arrested.

Carney was convicted of all three charges, and he now appeals.

## Discussion

█ The test to determine whether a defendant's statement is voluntary involves a three-part inquiry: "First, the trial judge must find the external, phenomenological facts surrounding the confession. Second, from these external facts, the judge must infer an internal, psychological fact: the mental state of the accused. Finally, the judge must assess the legal significance of this inferred mental state."[1]

█ Applying the first part of this test, we will overturn the trial judge's findings only if they were clearly erroneous.[2] On the second and third parts of this test we must exercise our independent judgment: "In determining the accused's mental state and its legal significance ... we conduct an independent examination of the entire record and base our conclusion upon the totality of circumstances surrounding the confession."[3]

█ When assessing the totality of the circumstances, we must consider "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[4] The ultimate standard is whether the police conduct has overcome the defendant's will to

1. *State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987).

2. *Beavers v. State*, 998 P.2d 1040, 1044 (Alaska 2000).

3. *Id.*

4. *Sprague v. State*, 590 P.2d 410, 414 (Alaska 1979) (quoting *Brown v. United States*, 356 F.2d 230, 232 (10th Cir.1966)).

resist and induced a confession that was not the defendant's voluntary choice.[5]

### The external facts are not disputed.

Our review of the first part of the voluntariness test is not demanding because the external facts surrounding Carney's confession are not subject to any serious dispute. At the time of this interview, Carney was a forty-three-year-old man with borderline intellectual functioning and considerable experience with the criminal justice system. He came to the interview voluntarily, and he was allowed to leave after the interview. The interview was mostly cordial. But the officers made repeated promises that Carney would not be arrested and that they would not reveal his statements to anyone else.

We conclude that Judge Torrisi's factual findings are not clearly erroneous. But there is a more serious question about the impact of these circumstances on Carney's mental state.

### The mental state: Carney believed that he would be prosecuted following his confession.

As noted above, we exercise our independent judgment on the second part of the voluntariness test, involving the defendant's mental state. We must evaluate the actual impact of the police officer's promises on Carney's confession: "In contrast to the *Miranda* test, which focuses on the objective facts of the suspect's encounter with the police, the test for whether a statement is voluntary rests in large measure on the subjective effect of the police conduct on the suspect's will."[6] We therefore focus on whether the officer's promises actually convinced Carney that he would not be prosecuted if he confessed.

There are at least two reasonable inferences from the officers' repeated promises that Carney would not be arrested. Carney could have believed that the officers would not be making any arrests at that time, at least until they had completed their witness interviews and consulted the district attorney. On the other hand, the officers' repeated promises could have led Carney to believe that he would never be arrested or prosecuted, even if he confessed to murder.

There is a similar ambiguity in the officers' repeated promises not to reveal Carney's statements. Carney could have believed that the officers were promising not to involve other people unnecessarily: that they would not tell his girlfriend that he had sexual relations with Timurphy and that they would not tell Timurphy's relatives and friends about the details of her demise. Or Carney could have believed that the officers would keep their investigation completely secret and that his statement would not be used for the purpose of a criminal prosecution.

Based on our independent review of the record, we agree with Judge Torrisi's conclusion that Carney did not actually believe that he would never be arrested and prosecuted. Carney was experienced with the criminal justice system, and he understood that he could terminate an interview upon request. He knew that the officers were conducting a series of investigative interviews, and he was aware that his interview was being recorded for later use. The officers' promises that Carney would not be arrested were combined with limiting assurances: that he could go home after the interview and that he would not be arrested that day.

At the end of the interview, Carney told both Kirby and Pasquariello that he wanted Kirby to perform his arrest. If Carney believed that the officers were promising not to prosecute him, then he would not have been concerned about how he would be arrested. Carney expressed no surprise when Pasquariello explained that they would be contacting the district attorney for direction. Carney stayed up all night worrying that the police were coming to arrest him, and he expressed no objection when the officers actually arrested him the next day. Following his arrest, he asked about the decision to press

5. *Stobaugh v. State*, 614 P.2d 767, 771–72 (Alaska 1980).

6. *Edwards v. State*, 842 P.2d 1281, 1285 (Alaska App.1992); *see also Sovalik v. State*, 612 P.2d 1003, 1007–08 (Alaska 1980); *Thompson v. State*, 768 P.2d 127, 131–32 (Alaska App.1989).

charges and asked if he could speak with the district attorney.

Taking all of these circumstances into consideration, we conclude that Carney believed that the officers' promises were limited. He did not believe that the officers were promising not to prosecute him; he believed that they were promising not to arrest him immediately following the interview, at least until they completed their investigation. He did not believe that the officers were promising not to use his statement as part of a prosecution; he believed that the officers were promising not to reveal his statement unnecessarily to his girlfriend or Timurphy's family. This conclusion takes us to the third part of the test—the legal significance of Carney's mental state.

### The legal significance: Carney's confession was voluntary.

■ To determine the legal significance of Carney's confession, we must determine whether it was his voluntary choice or the product of the officers' promises of leniency. In the past, the United States Supreme Court has stated that a confession must not be "obtained by any direct or implied promises, however slight." [7] But this language has not been applied literally. [8] The final test is whether the officers' promises were "sufficiently compelling to overbear the suspect's will in light of all [the] attendant circumstances." [9]

Carney relies on Alaska cases holding that confessions induced by promises not to prosecute are involuntary. In one case, the defendant admitted that he was the driver of an abandoned vehicle immediately after an officer assured him that he was "not interested in prosecuting anyone for drunk driving." [10] We concluded that the defendant's confession was illegally coerced by the officer's promise that he would not be prosecuted. [11]

In a second case, a vagrant admitted that he had accidentally set an empty warehouse on fire after the police told him that if he started the fire accidently "[i]t's an over and done deal." [12] We ruled that the defendant's confession was improperly induced by the officers' promises. [13]

Likewise, in a third case, the defendant confessed to sexual abuse of a fourteen-year-old girl only after an officer told him that his statement would be "off the record." [14] We held that this assurance of confidentiality was equivalent to a promise of immunity, and that the defendant's resulting confession was involuntary. [15]

These cases suggest that a confession is involuntary if it is induced by promises implying immunity from prosecution. [16] In the present case, the officers' promises that they would not arrest Carney and their assurances that they would not reveal his statements to others are similar to the promises of immunity in these prior cases. If Carney had actually believed that he would not be arrested and prosecuted, then these promises would have rendered his confession inadmissible.

■ But Carney's reaction to the officers' promises distinguishes this case. If a suspect does not rely on a promise when he decides to confess, then the promise does not render the confession involuntary. [17] Car-

7. *Beavers*, 998 P.2d at 1049 (quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)).

8. *See Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

9. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988).

10. *Smith v. State*, 787 P.2d 1038, 1039 (Alaska App.1990).

11. *Id.*

12. *Miller v. State*, 18 P.3d 696, 698 (Alaska App. 2001).

13. *Id.* at 701.

14. *Jones v. State*, 65 P.3d 903, 905 (Alaska App. 2003).

15. *Id.* at 909.

16. *Id.; Smith*, 787 P.2d 1038.

17. *See Gilchrist v. State*, 585 So.2d 165, 179 (Ala.Crim.App.1991); *State ex rel. Collins v. Superior Court*, 145 Ariz. 493, 702 P.2d 1338, 1340 (1985); *Reynolds v. State*, 327 Md. 494, 610 A.2d 782, 789 (1992).

ney's statements and conduct reveal that he expected to be prosecuted if he confessed. We agree with Judge Torrisi's conclusion that Carney did not rely upon the officers' promises, and that he "had the intellectual and emotional capacity to understand what was happening, and to resist and leave if that is what he had wanted to do."

### Conclusion

We conclude that Carney's confession was not induced by promises of leniency or immunity. We AFFIRM the superior court's judgment.